# IN RE JUSTICE V.*
## (AC 29268)

DiPentima, Gruendel and Lavine, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 22—officially released December 9, 2008

*David J. Reich,* for the appellant (respondent).

*Colleen Broderick,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Amy L. A. Klein,* for the minor child.

502

LAVINE, J. General Statutes § 46b-129 (j) provides in relevant part: "Upon finding . . . that any child . . . is . . . neglected . . . the court may commit such child . . . to the Commissioner of Children and Families. . . . *The court shall order specific steps that the parent must take to facilitate the return of the child . . . to the custody of such parent.*" (Emphasis added.) The main issue in this appeal is whether the court's failure to order specific steps to facilitate reunification following a finding of neglect precludes the granting of a petition for the termination of parental rights on the ground of abandonment. We conclude, under the circumstances of this case, that the court's failure to order specific steps does not preclude the termination of parental rights for abandonment.

The respondent mother appeals from the judgment of the trial court terminating her parental rights with respect to her minor child, claiming that the judgment should be reversed because (1) the court failed to order specific steps to facilitate reunification, (2) the court's findings that (a) the respondent abandoned the child and (b) it was in the child's best interest to terminate the respondent's parental rights were clearly erroneous, and (3) there was insufficient evidence to support the permanency plan submitted by the petitioner, the commissioner of children and families. We affirm the judgment of the trial court.[1]

The record discloses the following procedural history. The child was born in 2002. In the spring of 2006, the respondent filed a petition in the Court of Probate for the district of New Milford-Bridgewater to transfer guardianship (transfer petition) of the child to the

---

[1] The attorney for the minor child filed a statement in accordance with Practice Book § 67-13, adopting the position of the petitioner, and joined in the petitioner's brief.

child's maternal grandmother.[2] On June 1, 2006, at the conclusion of the hearing on the transfer petition, the Probate Court sua sponte issued a decree temporarily transferring custody of the child to the petitioner.[3] A hearing on the order of temporary custody was held in

[2] This court may take judicial notice of the Probate Court file. See *Schia-vone* v. *Snyder*, 73 Conn. App. 712, 717, 812 A.2d 26 (2002).

[3] In its order and decree, the Probate Court made the following additional findings of fact that are relevant to this appeal. When the respondent appeared for the hearing on the transfer petition, she behaved in a rude and inappropriate manner toward the court staff and had inappropriate interaction with the child. A local police officer was summoned, but the respondent continued to act in an inappropriate manner.

The Probate Court asked the department of children and families (department) to prepare a report with respect to the transfer petition. The report indicated that the respondent failed to appear for two scheduled visits with a social worker. It also stated that the respondent did not understand why the department was involved and that it was inconvenient for her to meet with the social worker because she was busy at her job. The respondent refused to sign a release permitting the department to obtain the child's medical records because she believed that the matter had nothing to do with the child's health. Moreover, according to the respondent, the transfer of guardianship was to be temporary until she was able to get her life in order. The department report recommended that it was in the child's best interest that temporary guardianship be granted to the maternal grandmother.

The child's attorney, Beth Gradowski, also filed a report expressing her opinion that the respondent and the child appeared to have a good bond. She also opined that if the respondent needed time to get her life in order, granting the maternal grandmother guardianship was in the best interest of the child. The child spends some weekends with her maternal grandmother and is comfortable there. Gradowski also opined that it was important for the respondent and child to have regularly scheduled visits.

The child's father had no objection to the temporary guardianship, but he wanted to be able to visit with the child. The respondent, however, did not want the father to visit with the child.

The court explained the role of guardian to the respondent, who was unwilling to accept the condition of supervised visits for the parents with the guardian. At the conclusion of the hearing, the respondent persisted in her inappropriate behavior and stated that she was "going to blow up the [department] . . . with phone calls."

On the basis of the evidence presented, the Probate Court found that both the respondent and the father have problems that render them unfit to be the child's guardians. The court expressed concern about placing the child with immediate family members and found that there were no other

the Superior Court on June 9, 2006, but the respondent failed to appear. Due to the respondent's default, the order of temporary custody was sustained.

On June 6, 2006, the petitioner filed a neglect petition for the child. As the result of threats that the respondent made to employees of the department of children and families (department), on November 14, 2006, the court entered a protective order prohibiting the respondent from having contact with the child, except as arranged by the department.

The trial on the neglect petition took place on January 16, 2007, and the respondent again was defaulted for failure to appear. On that date, the child was adjudicated neglected and again committed to the custody of the petitioner. The respondent sought to open the adjudication, but her request was denied. The respondent then filed a motion to revoke the child's commitment and to have the child's custody transferred to the child's maternal grandmother. On February 28, 2007, the petitioner submitted a permanency plan calling for the transfer of guardianship to the child's paternal grandmother. On April 20, 2007, the respondent's motion to transfer custody was denied, and a petition to terminate the respondent's parental rights was filed pursuant to General Statutes § 17a-112 (j).[4] The termination petition

relatives suitable at the time to be the child's guardian. The Probate Court decreed the child to be homeless and in need of immediate intervention by the department and ordered the respondent and father removed as guardians. The department employees were ordered to place the child in foster care and to determine visitation for the child with the respondent and father. The Probate Court "waived" all future decisions regarding the child to the Superior Court.

[4] The petitioner initially alleged two grounds as the basis for terminating the respondent's parental rights: abandonment and failure to achieve a sufficient degree of personal rehabilitation. General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition . . . if it finds by clear and convincing evidence that . . . (3) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior

was consolidated with the respondent's objection to the permanency plan, and both were tried on July 16 and 17 and August 31, 2007. The court issued its memorandum of decision on September 26, 2007, terminating the respondent's parental rights solely on the ground of abandonment and approving the permanency plan for the child. The respondent appealed. Additional facts will be included in subsequent parts of this opinion.

I

The respondent first claims that, at the time the child was adjudged neglected, the court improperly failed to order specific steps pursuant to § 46b-129 (j). The respondent failed to bring this omission to the attention of the court and claims, on appeal, that the judgment terminating her parental rights should be reversed because the court's failure to order specific steps was plain error that resulted in manifest injustice. Although we agree that the court failed to follow the dictates of the applicable statute and order specific steps, we conclude that no injustice occurred because the respondent's parental rights were terminated on the ground of abandonment, not failure to achieve sufficient personal rehabilitation. See General Statutes § 17a-112 (j).

The following procedural history and facts are related to the respondent's claim. At the time the petitioner filed the neglect petition on June 6, 2006, she also filed form JD-JM-106, Rev. 5-99, entitled "Specific Steps." In its memorandum of decision on the termination of parental rights petition, the court found that the specific steps form had never been signed or otherwise ordered

Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

by the court and delivered to the respondent. Although the petition for termination of the respondent's parental rights originally alleged abandonment and failure to achieve a sufficient degree of personal rehabilitation; see footnote 4; the petitioner withdrew the ground of failure to achieve sufficient personal rehabilitation prior to trial. In its memorandum of decision on the termination petition, the court made a great number of factual findings, two of which are significant with respect to the respondent's claim, namely, that the respondent would not have benefited from reunification efforts and that the respondent was not seeking to be reunified with the child but to have custody of the child transferred to the child's maternal grandmother.

Our analysis begins with the applicable standard of review. Practice Book § 60-5 "provides in relevant part that [t]he court may reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . . The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." (Internal quotation marks omitted.) *State* v. *LaBrec*, 270 Conn. 548, 559, 854 A.2d 1 (2004).

In this instance, we are called on to construe § 46b-129 (j) as it pertains to the termination of the respondent's parental rights under § 17a-112 (j) (3) (A). Statutory construction is a question of law to which the plenary standard of review applies. See *In re William D.*, 97 Conn. App. 600, 606, 905 A.2d 696 (2006), aff'd, 284 Conn. 305, 933 A.2d 1147 (2007). "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *State* v. *Strich*, 99 Conn. App. 611, 633, 915

A.2d 891, cert. denied, 282 Conn. 907, 920 A.2d 310, cert. denied, 552 U.S. 901, 128 S. Ct. 225, 169 L. Ed. 2d 171 (2007). Neither side claims that the relevant portion of § 46b-129 (j) is ambiguous. See General Statutes §§ 1-1 (a) and 1-2z.

Section 46b-129 concerns, among other things, the commitment of a child to the custody of the petitioner and neglect petitions and informs the court that "[u]pon finding and adjudging that any child . . . is uncared-for, neglected or dependent, [it] may commit such child . . . to the [petitioner]." General Statutes § 46b-129 (j). It also contains an "explicit statutory requirement that a parent be given 'specific steps' to accomplish to facilitate the return of the child"; *In re Shyliesh H.*, 56 Conn. App. 167, 179, 743 A.2d 165 (1999); to the custody of the parent. "Personal rehabilitation, therefore, is to be determined, in part, by compliance with those specific steps, which give the parent fair warning of what is required"; id.; to be reunited with the child.

"Parents have a constitutionally protected right to raise and care for their own children." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318, 460 A.2d 1277 (1983). "Where the legislature has chosen specific means to effectuate a fundamental right, failure to follow the mandatory provisions of the statute is plain error." (Internal quotation marks omitted.) *State* v. *Hicks*, 97 Conn. App. 266, 271, 903 A.2d 685, cert. denied, 280 Conn. 930, 909 A.2d 958 (2006). "A trial court commits plain error when it fails to apply a clearly relevant statute to the case before it." (Internal quotation marks omitted.) *State* v. *Guckian*, 27 Conn. App. 225, 246, 605 A.2d 874 (1992), aff'd, 226 Conn. 191, 627 A.2d 407 (1993). "It is plain error for a trial court to fail to apply an applicable statute, even in the absence of the statute having been brought to its attention by the parties." *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475,

480 n.6, 628 A.2d 946 (1993).[5] Here, the court failed to order specific steps. We conclude that although the court failed to comply with the statute, that failure did not result in manifest injustice. The fact that the respondent was defaulted for failure to appear does not change our conclusion. The court must comply with statutory requirements, even if a parent does not appear to contest the neglect petition. That conclusion, however, does not mark the end of our analysis.

"[P]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Jackson*, 73 Conn. App. 338, 386, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). The respondent has failed to demonstrate how the court's failure to order specific steps was so harmful that it resulted in manifest injustice.

---

[5] We note that none of the several counsel involved in this matter brought the court's failure to order specific steps to the court's attention when the child was found to be neglected. In instances where not only a parent's rights are at stake, but also the stability and permanency in a child's life, counsel who are aware that the court has not adhered to a statutory requirement are advised to bring the matter to the trial court's attention at a time when the oversight can be remedied.

As to raising the claim for the first time on appeal, "[o]ur Supreme Court has made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial. . . . This same principle requires parties to raise an objection, if possible, when there is still an opportunity for the trial court to correct the proposed error." (Citation omitted; internal quotation marks omitted.) *Powers* v. *Farricelli*, 43 Conn. App. 475, 478, 683 A.2d 740, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996).

The court's memorandum of decision reflects the court's understanding of the relevant law, noting that before parental rights can be terminated, the petitioner must prove by clear and convincing evidence that the department "made reasonable efforts to locate the parent and to reunify the child with the parent . . . ." General Statutes § 17a-112 (j) (1). "[The] court need not make that finding, however, if the evidence establishes that the parent is unable or unwilling to benefit from reunification efforts . . . ." *In re Shaiesha O.*, 93 Conn. App. 42, 47, 887 A.2d 415 (2006). The court may find either that the department made reasonable efforts or that the respondent would not have benefited from such efforts. *In re Amelia W.*, 62 Conn. App. 500, 504–505, 772 A.2d 619 (2001). In this case, the court found that specific steps had not been ordered to reunify the respondent with the child but that the respondent would not have benefited from efforts to reunify her with the child.

The facts found by the court and the evidence in the record support the court's conclusion that the respondent would not have benefited from departmental services. Following the transfer of custody, the court found that the respondent exhibited threatening and inappropriate behavior toward department employees. On July 19, 2006, the respondent spoke with social worker Bryan Karibian and directed "a series of accusations laced with invectives and profanity" at the department in general and Karibian specifically. The respondent stated: "I have never slapped my fucking child. She needs to be hit. . . . You know, I don't hit [my child] but she needs a good fucking slap." The court found that the respondent provided some insight to the genesis of her hostility toward the department, stating that "you have ruined [the child]. . . . She is fucking ruined. I was in the system. I was sent to juvy because my father beat the fuck out of me. But because my parents have

money, I wasn't taken into your system."[6] The respondent also threatened "to do something criminal" to the department employee who had prepared the guardianship study for the transfer petition. The respondent concluded, stating, "I don't want to see my daughter because if I do, I will fucking take her and bring her to my mom's." She advised Karibian that she would send a picture of her middle finger if anyone asked her to work with department employees.

In March, 2007, Kerri Dejager, a department social worker assigned to the case, sent the respondent a letter introducing herself but only met the respondent in court on April 25, 2007. On that date, Dejager attempted to speak to the respondent and to give her a business card. The respondent refused to speak with Dejager or to take the business card.

We conclude that the court's failure to order specific steps did not result in manifest injustice for a number of reasons. First, given the requirement of § 17a-112 (j) (3) (B), a failure to order specific steps would preclude termination for a failure to achieve sufficient personal rehabilitation, but, as noted, the court did not terminate the respondent's parental rights on that ground. See *In re Shyliesh H.*, supra, 56 Conn. App. 179. Second, the court terminated the respondent's parental rights on the ground of abandonment, having found repeatedly that the respondent also failed to visit the child or to inquire as to her welfare from the date of the hearing

_____

[6] The court found that the respondent's hostility toward the department remains somewhat of a mystery, aside from her allusion to her adolescent experience. The court noted that the petitioner did not seek the order of temporary custody on June 1, 2006. The Probate Court issued the order sua sponte. The trial court noted that the department report endorsed the respondent's petition to transfer guardianship to the maternal grandmother. Although the respondent was involved with the department in 2004 as the result of allegations of domestic violence between the respondent and the father, there is no indication that the interaction with the department in 2004 resulted in any detriment to the respondent.

in the Probate Court, June 1, 2006, until the trial on the termination petition in August, 2007. The respondent failed to keep the department or the court informed of her whereabouts. Third, the court also found that had the department provided the respondent with services, she would not have benefited from them, as she was hostile toward the department and its employees. Fourth, the respondent was not seeking to be reunified with the child but to have the child's guardianship transferred to the child's maternal grandmother. Finally, the respondent concedes, on the basis of case law, that parental rights may be terminated in the absence of specific steps having been ordered. See *In re Michael M.*, 29 Conn. App. 112, 126, 614 A.2d 832 (1992); *In re Shavoughn K.*, 13 Conn. App. 91, 99–100, 534 A.2d 1243 (1987), cert. denied, 207 Conn. 805, 540 A.2d 374 (1988).

In her brief to this court, the respondent argues that had she known what was necessary to be reunified with the child, as ordered by the court, she would have followed the specific steps. She claims that she lost the fundamental right to rear her child because the court failed to order specific steps to ensure cooperation between the respondent and the department. She also contends that because there was no evidence that she ever violated a court order, the court could not find that she would not have benefited from court-ordered steps.

The respondent's argument fails for several reasons. First, the Probate Court, at the time it issued the order of temporary custody, ordered that visitation between the child and the respondent was to be determined by the department. The trial court found that from the time the order of temporary custody issued until the time the protective order was issued, department employees sought to facilitate visitation by reaching out to the respondent. The respondent, however, rebuffed the entreaties of the employees in a hostile and threatening

manner. Second, the November, 2006 order of protection required the respondent to communicate and to visit with the child as facilitated by the department. The court further found that the respondent failed to take advantage of that court order.

Moreover, the respondent failed to address the element of manifest injustice. The respondent's parental rights were terminated on the ground of abandonment because she failed to visit with or to inquire about her child for more than one year. The respondent has failed to demonstrate how the court's judgment resulted in an error so harmful that a failure to reverse the judgment would result in manifest injustice and destroy the public's confidence in our judicial system.

## II

The respondent claims that the court's findings that (1) she had abandoned the child and (2) it was in the best interest of the child to terminate her parental rights are clearly erroneous. We disagree.

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Ryan R.*, 102 Conn. App. 608, 617–18, 926 A.2d 690, cert. denied, 284 Conn. 923, 924, 933 A.2d 724 (2007).

We review a challenge to the court's factual findings in a termination of parental rights case by the clearly erroneous standard. *In re Selena O.*, 104 Conn. App.

635, 644, 934 A.2d 860 (2007). "The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Brittany J.*, 100 Conn. App. 329, 334, 917 A.2d 1024 (2007).

"Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 789–90, 952 A.2d 1280 (2008).

A

The respondent claims that the court's finding that she had abandoned the child was clearly erroneous. Our review of the court's memorandum of decision and the record leads us to a contrary conclusion.

"A parent abandons a child if the parent has failed to maintain a reasonable degree of interest, concern or

responsibility as to the welfare of the child . . . . General Statutes § 17a-112 (j) (3) (A). Abandonment focuses on the parent's conduct. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . Section 17a-112 [(j) (3) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) *In re Ilyssa G.*, 105 Conn. App. 41, 46–47, 936 A.2d 674 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008).

In its memorandum of decision, the court made the following findings of fact by clear and convincing evidence. At the time of trial, the respondent was twenty-three years old. She had spent most of her life in Bristol and left high school when she became pregnant with the child. The respondent subsequently obtained a graduate equivalency degree and has held several jobs. The father and the respondent were in a relationship for several years but never married. The end of their relationship was marked by domestic violence. The respondent had been the child's primary custodian because the father is legally blind and has never been a placement resource for the child. The father is employed, however, and provides some financial support for the child.

The court found that the respondent sought to transfer guardianship of the child so that the respondent could attend school in New York. The Probate Court ordered the department to prepare a guardianship study, but the respondent refused to cooperate with department employees. On the day of the hearing on the transfer petition, the respondent behaved erratically and inappropriately while she was in the court. She

allegedly slapped the child's face and grabbed her arm abruptly. The Probate Court issued an order of temporary custody to the petitioner and ordered that visitation between the respondent and the child be directed by the department.

Between June 1 and August 31, 2006, the respondent did not ask department employees to arrange for her to visit the child, nor did she inquire as to the child's well-being. On August 31, 2006, the respondent attended a case status conference but refused to talk to the social worker assigned to the case. The respondent, however, was upset by the prospect of the child's being placed with the child's paternal grandmother and shouted that she would kill the department social worker if the child were placed with the paternal grandmother.

Another case status conference was held on November 2, 2006. The respondent asked the assigned social worker why the child could not be placed with the maternal grandmother. The respondent did not want the child to be placed with the paternal grandmother because she did not have an automobile and did not speak English. The social worker explained to the respondent that she, the respondent, was viewed as a threat to kidnap the child and that the maternal grandmother expressed no concern about the respondent's threats or behavior. For those reasons, the social worker explained, the department would not recommend placing the child with the maternal grandmother. The respondent stated: "I will break down her door with a gun and kidnap my daughter." The social worker informed the respondent that she had made another threat and that the social worker was going to report it. Moreover, the social worker stated to the respondent: "This is what I mean when I say you are a threat." The respondent answered: "You didn't record it. You have no proof I said this."

Subsequently, on November 6, 2006, the petitioner filed a motion for an order requesting that the court prohibit the respondent from going to the child's residence and that the respondent be ordered to refrain from contacting the child, except through visitation supervised by the department. The respondent failed to appear when the motion for an order was heard on November 14, 2006. The court granted the motion and issued the following order: "[The respondent] is to have no contact with the child . . . except that which is arranged by [the department]. [The respondent is] not to go within 100 yards of the child or go to the home where the child resides. This extends to phone calls, e-mails, [third] party or personal contacts with anyone in that residence."

The court found that, throughout the proceedings, neither the department nor the court continuously knew the respondent's whereabouts. The respondent's attendance at hearings was inconsistent. On December 12, 2006, out of concern that the respondent had transportation difficulties, the court ordered the department to provide transportation for the respondent, if requested. The order was issued again on January 16, 2007. The respondent never contacted the department to ask for transportation assistance.[7]

Following the adjudication of neglect on January 16, 2007, the respondent consistently attended all court hearings, except for one instance when she could not attend for medical reasons. The court also found that the respondent consistently maintained that she wanted the child to be placed with the maternal grandmother. Of primary importance, however, is the court's finding that the respondent never sought to have the child

[7] At trial, the respondent offered evidence that between November, 2006, and March, 2007, her automobile was inoperable. The court accepted that testimony but noted that the court's transportation order addressed that concern had the respondent been willing to ask for transportation assistance.

returned to her care or custody. Between November, 2006, and July 16, 2007, the respondent made no effort to contact department employees to ask to visit with the child or to inquire about her well-being. The respondent never made an effort to see the child until the termination of parental rights petition was tried.

With respect to the child, the court found that she was five and one-half years old and had been in the petitioner's custody for fifteen and one-half months at the time of trial. The petitioner had placed the child with the paternal grandmother in Hartford, where she had resided for almost one year. The child shares the home with two of her half brothers.[8] Although the paternal grandmother speaks only Spanish, the boys are bilingual, and the child understands basic instructions from her grandmother. The department provides support services to the paternal grandmother.

The court found that the child's adjustment since leaving the respondent's care was influenced by prior events. When she was first placed in foster care, the child experienced nightmares. The foster mother reported that the child was especially fearful of the respondent's boyfriend, Wally, who allegedly locked the child out of the house and car and struck her. The respondent allegedly laughed when Wally locked the child outside when it was cold and dark. The child also told her foster mother that she had watched the respondent and Wally engage in sexual intercourse and demonstrated what her mother did with Wally. During the child's most recent visit with her maternal grandmother, the child asked if Wally was still with the respondent. The child is receiving therapeutic services through the department to deal with her concerns.

Despite the child's troubling experiences, the court found that the child is described as highly intelligent,

---

[8] The half brothers are children of the father from another relationship.

sweet, precocious and mature. She sees her father daily, does well in school and interacts well with other children. She has developed a strong bond with her half brothers and paternal grandmother. In April, 2007, the child told her social worker that she wanted to live with her paternal grandmother forever.

With respect to the petitioner's allegation that the respondent had abandoned the child, the court noted that § 17a-112 (j) (3) (A) provides that a "child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ." The court found by clear and convincing evidence that the respondent's conduct constituted abandonment. After the child was removed from her custody, the respondent made no effort to have any contact with the child. She did not visit the child, did not display love or affection for the child or send cards, letters, notes or gifts to the child. The respondent explained that she did not send cards, notes or letters to the child because the child cannot read and the paternal grandmother cannot read English. She did not send the child gifts because she should not have to give gifts to show love. The court found that there were a number of people who could have and would have passed the respondent's greetings along to the child, but the respondent did not avail herself of those individuals.

The court did not credit the respondent's testimony that she was waiting for the department to arrange visitation pursuant to the protective order. The court found the testimony to be a self-serving interpretation of the language of the protective order. The respondent made it difficult for employees of the department to communicate with her. Moreover, the respondent made no effort to see or inquire about the child from June 1, 2006, until the time the protective order was entered,

and the respondent's subsequent conduct was consistent with her prior behavior. Finally, the court found that the respondent was represented by counsel at all times and that she never sought to modify or vacate the order of protection.[9]

Although the respondent showed some interest in the child by consistently seeking to have the child placed with the maternal grandmother, had negative feelings toward the father and did not want the child to live in Hartford, the court found that that interest was not sufficient to defeat the overwhelming nature of abandonment otherwise demonstrated by the respondent's behavior.

On the basis of our review of the court's memorandum of decision and the record, including the exhibits and trial transcript, we conclude that the court's finding that the respondent had abandoned the child was not clearly erroneous. For more than one year, the respondent failed to approach employees of the department to initiate visits with the child, as ordered by the Probate Court, or to inquire about her welfare. For those reasons, we conclude that there was clear and convincing evidence that the respondent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.

B

The respondent also claims that the court's finding that it was in the best interest of the child to terminate the respondent's parental rights was clearly erroneous. We are not persuaded.

___

[9] The court noted that it properly may consider a respondent's failure to seek modification of a protective order in determining a statutory ground for termination of parental rights. *In re Alexander C.*, 67 Conn. App. 417, 427, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003).

"[Once] the court finds that the petitioner has proven by clear and convincing evidence that one of the statutory grounds for termination of parental rights exists, it must then determine whether termination is in the best interests of the child. . . . The best interests of the child include the child's interests in sustained growth, development, well-being and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings delineated in [§ 17a-112 (k)]." (Internal quotation marks omitted.) *In re Trevon G.*, supra, 109 Conn. App. 794–95.

After finding that the respondent had abandoned the child, the court made the seven findings required by § 17a-112 (k). The court found that at all relevant times, department employees were available and willing to provide services to the respondent, but the respondent eschewed them. Department employees made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.

As required, the court also found that the child has significant bonds with her paternal grandmother, her half brothers and her father. Her father and his family love her. The child's feelings toward the respondent are not clear, and it is not known how much she thinks about the respondent. In April, 2007, the paternal grandmother reported that it had been months since the child mentioned the respondent. When the child learned from her maternal grandmother that Wally was no longer with the respondent, she asked if this meant that she could go home.[10] The child reported to her social worker

[10] The court noted concern for the child's relationship with her maternal grandmother if the respondent's parental rights were terminated and found that the maternal grandmother's affection and commitment to the child

that she wants to live with her paternal grandmother "forever and ever and ever." Although the child still remembers her mother,[11] she is safe, secure and happy in her paternal grandmother's home. Because the respondent was not seeking to be reunified with the child, the child's remaining emotional ties to the respondent are not sufficient to defeat a claim for termination. The respondent failed to adjust her circumstances and to address her behavioral issues, the court found, and, therefore, it was not in the child's best interest to reunite her with the respondent.

The court also found that no third party has prevented a meaningful relationship from developing or being maintained between the respondent and the child. Although the respondent blames the department for the present circumstances, the court found that the respondent's view was not reasonable, as she is responsible for having abandoned the child and refusing to cooperate with the department. In response to the respondent's argument that the protective order prevented her from seeing the child, the court found that the respondent ignored her behavior that necessitated the protective order.

The court concluded that it was in the child's best interest to terminate the respondent's parental rights.[12] On the basis of our review of the entire record, we conclude that the court's finding with regard to the best interest of the child is not clearly erroneous. There is

were manifest. The court found that the bond between the maternal grandmother and child was good for the child. The court noted the petitioner's mandate to continue to assess the child's situation and to make accommodations for the relationship, as it is in the child's best interest.

[11] "Our courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006).

[12] The court noted that the guardian ad litem and counsel for the child were in support of the termination of the respondent's parental rights.

clear and convincing evidence that the child suffered adversely when she was in the respondent's custody, the respondent was unwilling to accept services from the department and the child is thriving in her paternal grandmother's home where she lives with her half brothers, sees her father on a daily basis and is doing well in school.

## III

The respondent's final claim is that the court improperly approved the permanency plan for the child because the petitioner presented insufficient evidence to support the plan, specifically, that the paternal grandmother did not testify that she wants permanent guardianship of the child and that she can protect her.[13] We disagree with this claim.

General Statutes § 46b-129 (k) provides in relevant part: "(1) Nine months after placement of the child . . . in the care and custody of the commissioner pursuant to . . . removal of a child . . . the commissioner shall file a motion for review of a permanency plan. . . . Any party seeking to oppose the commissioner's permanency plan shall file a motion in opposition not later than thirty days after the filing of the commissioner's motion for review . . . which motion shall include the reason therefor. . . . The court shall hold evidentiary hearings in connection with any contested motion for review of the permanency plan. The commissioner shall have the burden of proving that the proposed permanency plan is in the best interests of the child . . . . (2) . . . [T]he court shall approve a permanency plan

---

[13] In her reply brief, the respondent raised for the first time a claim that the petitioner failed to present expert testimony that it was in the best interest of the child to terminate the respondent's parental rights. This court does not review claims raised for the first time in a reply brief because the petitioner is not afforded an opportunity to respond to such claims. See *In re Darien S.*, 82 Conn. App. 169, 185 n.17, 842 A.2d 1177, cert. denied, 269 Conn. 904, 852 A.2d 733 (2004).

that is in the best interests of the child . . . and safety shall be of paramount concern in formulating such plan. . . ."

"At the hearing on the motion for review of permanency plan, the judicial authority shall determine whether efforts to reunify the child with the parent have been made, whether such efforts are still appropriate, and whether the commissioner has made reasonable efforts to achieve the permanency plan for the child. The judicial authority shall also determine whether the proposed goal of the permanency plan is in the best interest of the child by a *fair preponderance of the evidence*, taking into consideration the child's need for permanency. The child's health and safety shall be of paramount concern in formulating such plan." (Emphasis added.) Practice Book § 35a-14 (d).

The court reviewed the permanency plan at the time of the termination trial. In its memorandum of decision, the court approved the plan to transfer custody and guardianship of the child to the paternal grandmother, finding that the petitioner had made reasonable efforts to achieve the permanency plan. The role of an appellate court with regard to a sufficiency of the evidence claim is well established. "An appeal based on the sufficiency of evidence to support a factual finding carries a legal and practical restriction to review. The function of an appellate court is to review, and not to retry, the proceedings of the trial court. . . . Further, we are authorized to reverse or modify the decision of the trial court only if we determine that the factual findings are clearly erroneous in view of the evidence and the pleadings in the whole record, or that its decision is otherwise erroneous in law." (Internal quotation marks omitted.) *In re Halle T.*, 96 Conn. App. 815, 834, 902 A.2d 670, cert. denied, 280 Conn. 924, 908 A.2d 1087 (2006).

Following the finding of neglect, on February 15, 2007, the respondent filed a motion to transfer custody

and guardianship of the child to her maternal grandmother, claiming that the transfer would be in the child's best interest. The petitioner objected to the motion, citing the Probate Court's determination that the maternal grandmother was not an appropriate placement given the respondent's behavior and a report concerning the child and the maternal grandmother. On July 21, 2006, the child objected to a visit with her maternal grandmother, who, she stated, "hit" her a lot. The child's foster mother had to carry the child to the car to facilitate the visit.

On February 28, 2007, the petitioner filed a motion to review the permanency plan to terminate the respondent's parental rights and to transfer guardianship of the child to her paternal grandmother. The plan called for the termination of the respondent's parental rights and the transfer of guardianship to the child's paternal grandmother. The petitioner sought to terminate the respondent's parental rights because the respondent refused to cooperate with department employees, some of whom she had threatened, and failed to visit the child or to inquire about her well-being. The petitioner also was concerned about the child's safety with the maternal grandmother. The child's father was not a placement option, but he has cooperated with members of the department and is consistently involved in the child's care. The child's paternal grandmother was a placement resource for the child, and the child's father had no objection to that placement. According to the April 17, 2007 social study that was before the court, the child's paternal grandmother has stated a willingness to be the child's guardian. The respondent, therefore, cannot prevail on her claim that there was insufficient evidence before the court that the child's paternal grandmother was willing to become the child's guardian. Moreover, there is evidence in the record that the

paternal grandmother has provided the child with permanency in a healthful and safe environment. See Practice Book § 35a-14 (d). In the words of the child herself, she wants to live with her paternal grandmother "forever and ever and ever."

The judgment is affirmed.

In this opinion the other judges concurred.