IN RE CALEB P. ET AL.*

Superior Court, Judicial District of Windham,
Child Protection Session at Willimantic
File No. W10-CP13-016560-A

---

* Thus entitled in accordance with General Statutes § 46b-124 (b) and Practice Book § 32a-7. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Superior Court.

Memorandum filed April 22, 2014

*Kyle B. Wilkinson*, for the respondent father.

*Doris D'Ambrosio*, for the petitioner, Melissa P.

*Stephen J. Adams*, for the minor children.

HON. FRANCIS J. FOLEY III, JUDGE TRIAL REF-EREE. This petition is assigned for a contested hearing on the termination of the parental rights of Matthew J. to the minor children, Caleb P., born November 5, 2006, and Aria P., born November 10, 2007. The case arose as a petition by the children's mother, Melissa P., to terminate the parental rights of the male biological parent. It was filed on November 28, 2012, in the Northeast Regional Children's Probate Court. The petition sought a termination of the biological father's parental rights on the grounds that the father, Matthew, abandoned the children pursuant to General Statutes § 45a-717 (g) (2) (A) and that there is no ongoing relationship as defined in § 45a-717 (g) (2) (C), and to allow further time for the establishment or reestablishment of the parent/child relationship would be detrimental to the best interests of the children.

On September 4, 2013, the Probate Court entered interim orders directing Matthew to: 1. Attend parenting class, 2. Obtain legal employment, 3. Obtain appropriate housing, 4. Not to violate parole requirements, and to submit to hair toxicology testing. Thereafter, finding that Matthew had failed to satisfactorily complete those requirements, the court, without entering any finding as to the grounds, entered a decree on November 20,

2013, terminating the parental rights of the respondent. Whereupon, on December 20, 2013, the respondent filed a "motion to appeal" in the judicial district court in Windham. The motion was also filed in the Superior Court for Juvenile Matters on the same date as the file date appears. After providing the petitioner time to obtain counsel, the testimony was heard on April 16, 2014.

The court finds that service has been given in accordance with the Connecticut General Statutes and the Practice Book. Counsel have appeared for the respondent, the petitioner and the children. All have been competently represented by counsel. The court has jurisdiction in this matter. There is no other action known to this court to be pending in any other court affecting custody of the children except as shall be hereafter described. There does not appear to be any claim of American Indian tribal affiliation.

The biological parents were present in court for the trial for the termination of the respondent's parental rights. The court received certain documents into evidence without objection. The court heard the testimony of the Department of Children and Families (DCF) social worker, the child's mother, her boyfriend, the respondent, father, and grandparents. The court makes the following findings by clear and convincing evidence.

## GENERAL PRINCIPLES

For the benefit of the parties, the court will state some general principles of law that apply to any case seeking to terminate a parent's parental rights. First, this is very serious business. There are many United States Supreme Court cases going back nearly a hundred years which define the rights of families, parents and children, and the relationship of those rights to state intervention in the family. The earliest case, *Meyer* v. *Nebraska*, 262 U.S. 390, 399–401, 43 S. Ct. 625, 67 L.

Ed. 1042 (1923), announced that the parental right to conceive and raise children was a liberty interest warranting constitutional protection. The court indicated that the integrity of the family was essential to the pursuit of happiness and is protected by the fourteenth amendment to the constitution. No state shall "deprive any person of life, liberty or property, without due process of law . . . ."

In the case of *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), the Supreme Court acknowledged a "private realm of family life which the state cannot enter." And in *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944), the court established that "[I]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

Two more recent cases are more directly in point.[1] In *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972), the court addressed the rights of a noncustodial, unmarried, father of children. In awarding him guardianship of his children following the death of the mother, the court said, "[t]he rights to conceive and to raise one's children have been deemed essential . . . basic civil rights of man . . . and [r]ights far more precious . . . than property rights . . . ." (Citations omitted; internal quotation marks omitted.)

In *Santosky* v. *Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), Justice Blackmun, in raising the standard of proof to clear and convincing evidence for termination of parental rights, said:

---

[1] The earlier cases in the United States Supreme Court tended toward creating and protecting parental rights. It wasn't until much later that the court addressed children's rights.

"[E]ven where family relationships are strained, parents are entitled to fair procedures." "For the natural parents, however, the consequences of an erroneous termination is the unnecessary destruction of their natural family."

From these cases it is clear that parents, "even in families with strained relationships," have constitutionally protected rights. One of those rights is to place upon the petitioner in a termination of parental rights case, the burden of proving the grounds by clear and convincing evidence. It is not sufficient to show, as here, that the father is not a good guy or even that he is a bad guy, the obligation on the petitioner is to prove that statutory grounds exist to terminate his rights. This is not a simple contest between two estranged parents as to who is the better, more reliable parent and who has been inconsistent and even criminal. In such a contest the petitioner would easily prevail.

The parties should further understand that high standards of precision in the parental termination arena are neither achievable nor desired, as the acceptability of specific conduct and the determination of whether to terminate parental rights is a highly fact-specific process. See *In re Shane P.*, 58 Conn. App. 244, 254, 754 A.2d 169 (2000); see also *State* v. *Anonymous*, 179 Conn. 155, 165, 425 A.2d 939 (1979). "Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript. *In re Davonta V.*, [98 Conn. App. 42, 43, 907 A.2d 126 (2006)]." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 497, 940 A.2d 733 (2008). "It is well settled that the

trier of fact can disbelieve any or all of the evidence proffered . . . ." (Internal quotation marks omitted.) *Sheppard* v. *Sheppard*, 80 Conn. App. 202, 212, 834 A.2d 730 (2003). "It is well established that in cases tried before courts, trial judges are the sole arbiters of the credibility of witnesses and it is they who determine the weight to be given specific testimony." *In re Antonio M.*, 56 Conn. App. 534, 540, 744 A.2d 915 (2000); see also *In re Hector L.*, 53 Conn. App. 359, 366, 730 A.2d 106 (1999). "The probative force of conflicting evidence is for the trier to determine . . . ." *In re Ashley E.*, 62 Conn. App. 307, 316, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001)." *In re Jonathon G.*, 63 Conn. App. 516, 528–29, 777 A.2d 695 (2001). So, it is the duty of the court to resolve the conflicting testimony and apply those facts to the legal principles involved. As the court urged the petitioner to understand at each hearing when she was seeking to proceed with the case on her own without counsel, proceeding with a termination of parental rights petition is "a most serious and sensitive judicial action." *Anonymous* v. *Norton*, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975).

In this case, as in many others, the testimony of the parties revealed statements, actions and conduct that varied wildly in purpose and in effect. Neither parent came before the court with completely clean hands. Each believes they were acting with the highest of motive and with the best interests of the children in mind. The mother wishes to protect her present family relationships from what she sees as "not a consistent credible person." The father, who has many failings as a person and as a parent, wants a relationship with his children and for them to benefit by a relationship with him and his extended family. "[A] parent cannot be displaced because someone else could do a 'better job" of raising the child . . . ." *Matter of Corey L.* v. *Martin*

*L.*, 45 N.Y.2d 383, 391, 380 N.E.2d 266, 408 N.Y.S.2d 439 (1978), as cited in *In re Jessica M.*, 217 Conn. 459, 467, 586 A.2d 597 (1991).

## ORDER OF PROCEEDING

Generally speaking there are two phases of a termination of parental rights proceeding; they are adjudication and disposition. Practice Book (P.B.) § 35a-7 requires that the case proceed, first, to an adjudication, that is, a determination of whether the grounds for termination exist as alleged and as set forth for probate matters in § 45a-717 (g). Only after an adjudication finding that grounds exist may the court proceed to a disposition of the case. P.B. § 35a-7 (b). It is in the second, dispositional phase, that the court focuses on the best interest of the child. P.B. § 35a-9. In making the dispositional decision in a nonconsensual case, the court is mandated to consider and make written findings regarding six factors specified in § 45a-717 (h). See, e.g., *In re Tabitha P.*, 39 Conn. App. 353, 362, 664 A.2d 1168 (1995).

This manner of proceeding is contrary to conventional wisdom that the court's first consideration is the best interest of the child. In a termination of parental rights case, the first consideration is whether or not grounds exist to terminate a parent's rights (§ 35a-8—*Burden of Proceeding*), only then, after a finding that grounds do exist, does the court then address the best interests of the child in the dispositional phase of the case. "As a matter of statutory fiat, considerations of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. *In re Jessica M.*, supra, 217 Conn. 465. Therefore, the court will first consider the adjudication: do grounds exist to terminate?

## ADJUDICATION

Melissa alleges that Matthew has abandoned the children and that he has no ongoing relationship with the children.

"A parent abandons a child if the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . General Statutes § [45a-717 (g) (2) (A)]. Abandonment focuses on the parent's conduct. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . [The statute] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) *In re Ilyssa G.*, 105 Conn. App. 41, 46–47, 936 A.2d 674 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008); see also *In re Justice V.*, 111 Conn. App. 500, 514, 959 A.2d 1063 (2008), cert. denied, 290 Conn. 911, 964 A.2d 545 (2009). Abandonment focuses on the parent's conduct. It is a question of fact for the trial court, "which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion that [the statutory standard of abandonment] has been satisfied." *In re Adoption of Webb*, 14 Wn. App. 651, 657, 544 P.2d 130 (1975), review denied, 1976 Wn. LEXIS 767 (Wn. July 27, 1976); *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 15, 438 A.2d 801 (1981).

The second ground alleged is that there is no ongoing relationship with the children. Section 45a-717 (g) (2) (C) defines an "ongoing parent child relationship" as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." We have recognized that the statutory definition "is inherently ambiguous when applied to

noncustodial parents who must maintain their relationships with their children through visitation." *In re Jessica M.*, supra, 217 Conn. 468. In such a case, we held that "the ultimate question is whether *the child* has no present memories or feelings for the natural parent." (Emphasis in original; internal quotation marks omitted.) *In re Valerie D.*, 223 Conn. 492, 531, 613 A.2d 748 (1992).

With respect to this case, both the allegations of abandonment and the lack of an ongoing relationship must be viewed within the context of the great animosity the custodial parent, mother, harbors for the noncustodial father. It is clear that it is not permissible to terminate the parental rights of an individual when it is the actor (in this case the petitioner-mother) that "is largely or solely responsible for the existence of the grounds upon which termination is based." *In re Juvenile Appeal (84-BC)*, 194 Conn. 252, 256 n.6, 479 A.2d 1204 (1984). It is also true that in termination cases in the Probate Court that § 45a-717 (h) (6) requires the court to determine "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child . . . ."

With those legal principles in mind the court will address the facts of this case.

## FACTUAL FINDINGS

The details of this case are less than certain since both parents intentionally or unintentionally obfuscate and equivocate about who did what to whom and when it was or was not done. The larger picture is, however, very clear: biology allowed them to be parents before either was prepared for parenthood.

The mother, Melissa, is twenty-six, the father, Matthew, is soon to be twenty-nine. Neither has ever married. Neither parent graduated from high school. The

mother reports coming from an intact family, "an overall positive experience." She did not recall any involvement with DCF.

DCF records report involvement with the family in 2003 for inadequate supervision, her father's alcohol use and Melissa's substance abuse. Her substance abuse was so intractable that the parents arranged for Melissa to go to a residential treatment program located in Stowe, Maine. The family also agreed to participate in family therapy. Melissa was diagnosed with bipolar disorder and anxiety. DCF ultimately substantiated emotional neglect against the parents.

Melissa stated she hung out with the wrong crowd and experimented with drugs. Before she completed her third year of high school, at age sixteen, she dropped out of high school because she hated school.

The father, Matthew, basically grew up without a stable father figure. His parents divorced when Matthew was one year old. His mother has since remarried twice. Matthew had a good relationship with the second husband, but he passed away several years ago. His mother subsequently remarried in 2009. Matthew remembers this man as always being around when he was growing up and reports to having a good relationship with him at the present time.

Matthew's mother had to work around the clock as a single parent, according to Matthew, to support him and his two siblings. He admits to arguing with his mother, challenging her rules and drinking and using marijuana. Like Melissa, he dropped out of high school in his junior year, as he was often getting in trouble.

The two met in February, 2005. She was seventeen, he was nineteen. Matthew had just been released from Manson Youth Institution on November 24, 2004. Melissa recalls they "partied a lot," drinking frequently.

They argued a lot; Melissa believes that Matthew initiated the arguments more frequently than she did. Within a year of meeting, Melissa became pregnant. She alleges that Matthew pushed her down some stairs while pregnant and him punching her. She moved out from living with him and returned to her parents. Melissa said that their relationship ended in 2006, but DCF records indicate otherwise. Matthew was present at the hospital when Caleb was born. Matthew reports that they lived together as a couple for at least eight months after Caleb was born (11-5-06). It is likely that they were still involved in their relationship into March, 2007. DCF became involved with Matthew and Melissa in March, 2007, when both were arrested for assault and possession of drugs. Melissa was at the time pregnant with Aria. On July 23, 2007, she was sentenced to a suspended sentence with three years probation. She had admitted to possession of cocaine, although she maintained that she had purchased cocaine for one of Matthew's friends, and it was not for her personal use. On charges of assault three and threatening, Matthew was sentenced to jail and thus was not present when Aria was born on November 10, 2007. Unlike Melissa, he was not convicted of possession charges.

Even after Matthew's incarceration, the records reflect that Melissa continued to have problems with alcohol and marijuana. It is curious that Melissa continually views Matthew as a criminal for his many incarcerations, yet she does not view herself as a criminal for the many purchases of illegal drugs that she continued to do. In June, 2007, she admitted to DCF that she was four months pregnant and using alcohol and marijuana.

On August 31, 2007, Caleb was adjudicated to be a neglected child, and the court imposed a period of six months protective supervision by the court. Two weeks after Aria was born on November 10, 2007, Melissa

admitted to becoming highly intoxicated and unable to care for her children.

On August 19, 2009, Melissa admitted herself to a detoxification program at Stonington Institute. She said she had been drinking heavily at the time and knew she needed treatment. She spent three days in detox and then entered an adult in-patient program. She was released on October 10, 2009. While she was in-patient, her mother cared for the children, and Matthew was visiting the children from Saturday at noon until Sunday at 4 p.m.

The court makes these observations, not to attempt to equate or balance the problems of each parent, but to note that both parents have their own respective limitations.

## ON THE RESPONDENT'S INCARCERATION

Matthew has numerous periods of incarceration. Under Connecticut law, incarceration alone is not sufficient to terminate a parent's rights. The child protection cases in Connecticut tend to view the whole parent-child relationship; pre- and postincarceration. Incarcerated parents have the ability to participate in the child protection proceedings. Counsel are appointed for them; usually visitation is available to the incarcerated parent in prison upon request. In cases where DCF is involved, the agency provides transportation for the child or children. Here, the children did not get transported to the correctional facility.

This court considers the history of the parent including their criminal history, their propensity to criminal behavior, anything indicative of general parental fitness, the nature and quality of the relationship between parent and child or children preincarceration, the age and needs of the child or children, the effect of the incarceration on the children, the impact psychologically and

emotionally of prison visitation on the children, the degree of rehabilitation while incarcerated, an estimate of how long it may be postincarceration for the parent to verify the quality of their rehabilitative efforts, an assessment of the parenting ability of the person, the length of time the parent will be incarcerated as it affects meeting the child's everyday needs and the inability to meet parental responsibilities. A paramount consideration, of course, is the issue of stability and permanence for the children as well as the children's sense of time. (Language approved in *In re Katia M.*, 124 Conn. App. 650, 666–67, 6 A.3d 86, cert. denied, 299 Conn. 920, 10 A.3d 1051 [2010].) In the present case the court will also consider any barriers to the father maintaining or reestablishing a relationship with the children.

## PRESENT SITUATION

Matthew has testified that he has, at long last, completed his sentences and his probation. (Exhibit J.) He presently has housing and employment. Even while in prison, a magistrate's order continued to run at the rate of $118 per week for child support. Thus, he has accumulated an arrearage of more than $26,000. He reports his last payment of $500 was three years ago. He has represented to the court that he has been in contact with child support enforcement authorities notifying them of his present job so that a wage withholding order may issue. He has, under oath, represented that he may be entitled to a portion of the proceeds of a wrongful death action regarding the death of his father. He said that any proceeds of the settlement will be first applied to the child support arrearage.

Melissa maintains that she has not abused drugs or alcohol since her release from the Stonington Institute. She says she is in a long-term, six year relationship with her boyfriend. They have not married. She and the

children live with him, and he acts in all ways as if he were the father of Caleb and Aria. Melissa represents that she is now pregnant by her boyfriend. She says she and her boyfriend intend on getting married in the future, and she would like him to adopt Caleb and Aria. They have been living together since 2009.

## THE CHILDREN

Caleb is seven years old. He is in the second grade. Aria is six years old and attends the first grade. Both children are developmentally on track. All their educational, medical and financial needs are being met thanks to their mother. They appear happy and healthy.

Caleb spontaneously told the social worker that he has two daddies, Matt and Joel. "My daddy was bad and is in jail." Caleb said he would be happy if he could see his father. In the home, both children refer to Melissa's boyfriend as "dad." Aria did not express any recognition.

## THE GROUNDS

Abandonment has to do with interest and concern for a child. "A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) *In re Ilyssa G.*, supra, 105 Conn. App. 47; see also *In re Justice V.*, supra, 111 Conn. App. 514.

In this case, even given Matthew's less than stellar record of participation in the lives of the children, it would be hard to conclude that he has lost interest in the children. It would be difficult to find a father who has pursued visitation with his children with greater vigor.

The following is a recitation of the visitation orders entered in pursuit of time with his children. All references are to the Superior Court for the Judicial District of Windham:

4/2/08: Father shall have reasonable rights of access to the minor child, all contact between father and the child shall be by the discretion of the Department of Correction while father is incarcerated. (*Riley, J.*) At the time, Caleb was the only child. Further noted in the order (Mother's Exhibit 1), pickup and dropoff was "by mutual agreement," and holiday and school vacation visits were "by mutual agreement."

Matthew testified he wrote Melissa letters, he asked other people to talk to her, he inquired how Caleb was doing, he asked if she could have someone else bring him up for visits. Matthew got no visits. Melissa told the social worker that she chose not to have prison visits since she did not feel that this was a healthy environment for them.

8/3/09: Modification of Final Judgment: Father will exercise visitation with two minor children each Saturday noon thru Sunday 4 p.m. and at other times mutually agreeable. Matters of custody and visitation are referred to family mediation and an evaluation. This agreement will commence August 8, 2009. (*A. Santos, J.*)

9/ 24/09: Matthew filed a self-represented Motion for Contempt against Melissa for denying him visitation.

On September 9, 2009, the Family Division counselor prepared a mediation report.

"Appointments were scheduled with the parties for the purpose of mediation concerning their son, Caleb P., born on November 5, 2006. Father appeared for this appointment and was interviewed by this counselor. Mother failed to appear for the appointment, and attempts to reach her by telephone to both her residence and cell telephone numbers were fruitless.

The parties additionally have a child, Aria, who was born on November 10, 2007. While she was born prior to a judgment being entered, the initial complaint was

never amended to include this child. Consequently, mother was advised during a Short Calendar negotiation that need exists to commence a separate action as to the issues of custody and visitation concerning the younger child.

"Father presently is exercising access with both children each weekend from Saturday at noon through 4 p.m. on Sunday. He presently seeks to increase his access with the children. He is desirous of exercising visitation every other weekend from Friday at 5 p.m. through 5 p.m. on Sunday as well as alternating Tuesdays at 5 p.m. through Thursday morning when he would transport the children to day care. Furthermore, he seeks an order that the parties would share the major holidays of Thanksgiving, Christmas and Easter. Lastly, he proposes a modification of the current custody order insomuch as the parties would share joint custody of the children with their primary physical residence being with mother. As mother neither appeared for her appointment nor did she contact the undersigned to cancel or reschedule the same, it is assumed that she has no objection to the modifications which father has proposed.

4/19/10: On a motion for custody of Aria, the court awarded Melissa custody with visitation for Matthew, the same as Caleb, "Friday at 5:30 p.m. through Sunday at 5:30 p.m. alternating weeks with Wednesday at 5:30 through Friday at 12 p.m." (*Swords, J.*)

4/28/11: Father shall have supervised access to the both children at the Access agency in Danielson. Father shall be responsible for payment of the sessions.

7/6/11: The case has been referred back to the Access Agency. Zero tolerance will be given to [Matthew] if he fails to report to access agency on time for his scheduled visitation with the minor children. (*Fuger, J.*)

3/14/2012: The matter shall be referred to Access Agency. There shall be a supervised visit at the Father's expense. Mother shall cooperate with visitation. (*Graziani, J.*)

A month later Matthew was arrested on a probation violation and remained incarcerated until August, 2013.

On July 3, 2013, while Matthew was in jail, Melissa filed this petition to terminate Matthew's parental rights. He has not been able to see the children since April, 2012.

Melissa does not contest that Matthew has tried to contact her by phone, letters and text. He says he wanted to inquire about her and about the children. She says he was only trying to get back with her. She did not respond to his messages.

The court finds that this is not the record of a person who has failed to maintain any reasonable concern or interest in his children. He has at every possible opportunity sought to visit the children. When he did have visits with the children he brought them to his mother's house. The paternal grandmother testified that Melissa said she would continue allowing visitation with the grandmother when Matthew became incarcerated, but she did not. She has not seen her grandchildren in several years.

The petitioner has failed to prove by clear and convincing evidence that Matthew has abandoned his children.

Her second ground relates to failure to maintain a relationship with the children. While Matthew's record of nonsupport and confinement is nothing short of awful, that is not the test. Those issues may be proper matters of concern in determining the quantity and quality of present visitation; they do not bear on the test of statutory compliance. Matthew under intensive cross-

examination admitted that there may be no present relationship with his children. That is not the end of the inquiry. In *In re Valerie D.*, supra, 223 Conn. 532 n.35, the court concluded, "the state may not, under the circumstances of this case, obtain and maintain custody of the child so as to create a lack of an ongoing parent-child relationship . . . ." This court finds as a matter of law that this principle should extend not only to state actors, but to private individuals as well. Here, while the father's conduct is reprehensible as a father figure, Melissa resisted, especially over the past three years, any meaningful, cooperative visitation relationship between the father and his children. Her testimony was palpably hostile to Matthew, and her conduct exposed her intentions.

Nonetheless, Caleb remembers his father and would be happy to visit him. This supports a finding that, at least as to Caleb, he has present memories or feelings for his father. He did not have any difficulty in the notion that he has two daddies. It is not hard to understand why Aria may have limited recollection of Matthew. The petitioner cannot be permitted to prevent visitation and thence to allege that the father's parental rights should be terminated for failing to maintain a relationship. Further, the court does not conclude that to allow more time for the establishment or reestablishment of the parent/child relationship would be detrimental to the best interests of the children.

For those two reasons, the existence of positive present memories or feelings of the children (or at least one of them), and the conduct and attitude of the petitioner to frustrate the visitation of the father, the court concludes that the petitioner has not met her burden of proving by clear and convincing evidence that a statutory ground has been satisfied.

The petition must be, and is, denied. Judgment may enter accordingly.