******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE DELILAH G.*
(AC 45058)

Bright, C. J., and Elgo and DiPentima, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the
trial court terminating her parental rights with respect to her minor
daughter, D. The petitioner father and the mother had married while
he was in the United States Navy in California. After his deployment to
the east coast, he and the mother divorced in 2014, and the mother was
granted physical custody of D and the father was granted visitation
rights. After a separate custody trial in the District of Columbia, the
court granted the father physical custody of D and visitation rights to
the mother. In 2015, after the father married S, a court in Maryland
modified the custody and visitation order, permitting the father to move
to Connecticut. The mother's last visit with D occurred in 2017, before
the father moved to Connecticut and the mother moved back to Califor-
nia. Twice while the father, S and D lived in Connecticut, the Navy
deployed him for periods of approximately six months at sea, which
the mother claimed interfered with her ability to establish a relationship
with D. In 2018, D began behavioral health treatment with L, an advanced
practice registered nurse. In March, 2018, the Superior Court in Norwich
held a hearing on a motion the father had filed to modify the Maryland
custody and visitation order. After a hearing, which the mother did not
attend, the court ordered that the father would maintain sole legal and
physical custody of D and that the mother would be permitted to visit
D at the father's discretion upon proof of substance abuse counseling,
completion of a parenting course and reunification therapy. The father
then filed a petition to terminate the mother's parental rights with respect
to D on, inter alia, the statutory (§ 45a-717 (g) (2) (C)) ground that
she had no ongoing parent-child relationship with D. Prior to trial, the
Department of Children and Families completed a social study in which
it recommended termination of the mother's parental rights. The trial
court, in terminating the mother's parental rights, found that D, who
was nine years old at the time of the termination hearing, did not have
any present positive memories of her mother, whom she referred to at
times as her "other mother," her grandmother and her father's sister,
and that D's memories of her mother did not involve pleasant things,
which included her memory that the mother had pushed the father down
some stairs. The trial court further concluded that the interference
exception to the ongoing parent-child relationship ground for termina-
tion of parental rights was inapplicable and that the mother had made
minimal efforts to maintain a relationship with D. On appeal, the mother
claimed, inter alia, that the trial court, in concluding that she had no
ongoing parent-child relationship with D, failed to consider the father's
interference with the development of that relationship and D's positive
feelings toward her. *Held*:

1. The respondent mother could not prevail on her claim that the trial court
improperly concluded that the petitioner father had established the
ground of no ongoing parent-child relationship by clear and convincing
evidence: the cumulative effect of the evidence was sufficient to justify
the trial court's determinations that D had no present, positive memories
of the respondent mother and, thus, that there was no ongoing parent-
child relationship between them; moreover, contrary to the mother's
assertion that D had many present, positive memories of her, including
that D referred to the mother as her other mother, that she spoke with
the mother on S's phone when she was six years old, that D sometimes
discussed with L her memories of the mother, but with no contexts or
time frames, and that D stated that one time the mother gave her a lot
of toys, that evidence could not be construed as evidence of present
memories or feelings that was positive in nature, especially as there
was evidence that the mother gave D the toys after she had hit D in
the mouth with a hairbrush.

2. The trial court properly determined that the respondent mother failed to

establish that the actions of the petitioner father rendered inevitable her lack of a relationship with D: contrary to the mother's contention, the 2018 court order did not bar her from visiting with D but, rather, permitted visitation at the father's discretion upon proof that she had completed substance abuse counseling, a parenting course and reunification therapy, the court order did not preclude the mother from speaking with D by phone or mailing her letters or gifts, and the mother produced no credible evidence that she had engaged in the services prescribed in the court's order or that she sought to modify the court order before the filing of the termination of parental rights petition; moreover, the father's insistence that she abide by the court's orders, his refusal to let her visit D when she did not adhere to the court-ordered visitation schedule, and his deployments at sea and their effects on the mother's ability to visit with D, which the court considered, did not constitute interference with her relationship with D; furthermore, the mother presented no evidence regarding the quality and nature of her relationship with D before the father's alleged interference, and she made minimal effort to maintain a relationship with D, as she had custody of her for the first three years of her life, court-ordered visitation in the years since the original judgment transferred custody to the father, and the opportunity to maintain contact and a relationship with D through phone calls, letters and gifts.

3. The evidence was sufficient to support the trial court's conclusion that allowing further time for the reestablishment of a parent-child relationship between D and the respondent mother would be detrimental to D's best interests: the court did not improperly rely on L's statement, as the mother claimed, that D could experience emotional distress if she had contact with her mother, as the court was entitled to give great weight to the statements of professionals such as L, other evidence such as the department's social study supported the court's determination, and the court already had found that D had no relationship with her mother; moreover, D had negative memories of or feelings toward her mother, who presented no evidence that she ever engaged in the services prescribed in the court's 2018 visitation order or sought to modify that order and the evidence showed that the mother had hit D and pushed the petitioner father down some stairs; furthermore, the evidence showed that D had lived with her father and S since they married, and that her father and S, whom D referred to as her mother, were meeting her needs.

Argued February 28—officially released August 24, 2022**

*Procedural History*

Petition by the father to terminate the parental rights of the respondent mother with respect to their minor child, brought to the New London Regional Children's Probate Court and transferred to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, where the petition was withdrawn in part; thereafter, the case was tried to the court, *Hoffman, J.*; judgment terminating the respondent mother's parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent mother).

*Matthew C. Eagan*, assigned counsel, for the appellee (petitioner).

*Opinion*

ELGO, J. The respondent mother, Amanda L., appeals from the judgment of the trial court granting the petition of the petitioner father, Juan G., to terminate her parental rights with respect to her minor daughter, Delilah G. On appeal, the respondent claims that the court improperly determined that (1) there was no ongoing parent-child relationship between her and Delilah pursuant to General Statutes § 45a-717 (g) (2) (C)[1] and (2) she had abandoned Delilah pursuant to § 45a-717 (g) (2) (A). We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the respondent's appeal. The petitioner and the respondent met in 2010 in Norfolk, Virginia. In the spring of 2011, the petitioner learned that the respondent was pregnant with Delilah. At the time, the petitioner, who had enlisted in the United States Navy in November, 2007, was preparing to move to California due to a military relocation. In August, 2011, the petitioner moved to San Diego, California, in accordance with the orders he had received from the Navy. Delilah was born in December, 2011, in Oregon while the petitioner was deployed. When the petitioner completed his deployment in March, 2012, he visited the respondent and Delilah in Oregon. Shortly thereafter, in May, 2012, the respondent[2] and the petitioner married.[3] The respondent and Delilah then moved to San Diego to live with the petitioner. When the petitioner was deployed to the east coast in August, 2013, the family relocated to the Washington, D.C., area.

Throughout their marriage, the respondent and the petitioner's relationship was filled with ongoing problems and domestic violence. In May, 2014, the parties divorced. At that time, Delilah was approximately two and one-half years old. While the divorce was pending, the respondent had physical custody of Delilah and the petitioner had visitation time with Delilah. Later in 2014, a separate custody trial took place. The Superior Court of the District of Columbia issued a custody order on November 14, 2014, granting the petitioner physical custody of Delilah and providing the respondent with visitation rights. At the time the petitioner was granted physical custody of Delilah, she was almost three years old.

Thereafter, on October 9, 2015, both parties agreed to modify the custody and visitation order. Pursuant to the parties' agreement, and based on the evidence presented, on October 14, 2015, the Superior Court of the District of Columbia ordered that "the [respondent] shall have visitation with the minor child on alternate weekends. [The respondent] shall pick up the minor child from her school at the end of the school day on Fridays and drop off the minor child on Sundays at 6 p.m. at the visitor's center on [the] base . . . . [I]f [the respondent's] visitation with the minor child coincides

with a Monday holiday, the minor child shall remain with [the respondent] during the Monday holiday. [The respondent] shall drop off the minor child on Monday at 6 p.m. at the visitor's center on [the] base . . . ." (Footnote omitted.) At the time this order was issued, Delilah was almost four years old.

In 2015, the petitioner married Sara G., who has four children from a previous marriage. The petitioner and Sara G. also have two children from their marriage.

On September 29, 2016, when Delilah was almost five years old, the Circuit Court for Prince George's County, Maryland, modified the previous visitation order. The order prescribed that, "during every even number of years, [the respondent] will have the child during Thanksgiving, and Thanksgiving will be defined as Tuesday evening to Sunday evening . . . . [D]uring every odd number of years, [the respondent] will have the child from December 23 to December 30 . . . . [D]uring the summer, the [respondent] will have the child from the last week of June until the second week of August . . . . [T]he [petitioner] shall have the child on Father's Day weekend, and the [respondent] shall have the child on Mother's Day weekend . . . ." The order also permitted the petitioner to relocate to Connecticut. Specifically, the court order provided that the petitioner "shall have permission to relocate to Connecticut, and after [he] has relocated, the [respondent] will have visitation with the minor child, Delilah . . . any three day weekend (no school) . . . ." The order also stated that, "[u]ntil the [petitioner] deploys or relocates out of state, the [respondent] will maintain every other weekend visitation . . . . [A]fter relocation, the [respondent] is responsible for the pickup of the child and the [petitioner] is responsible for the return of the child . . . ." Thus, the petitioner maintained custody of Delilah while the respondent maintained visitation rights.

The respondent's last in-person visit with Delilah occurred in February, 2017, before the petitioner moved to Connecticut in March of that year. At the time of that last in-person visit, Delilah was five years old. The respondent continued to live in the Washington, D.C., area until the spring of 2018, at which point she moved back to California.

Delilah currently resides with the petitioner, her stepmother, Sara G., and her seven siblings in Connecticut. She has received behavioral health treatment from Amy Lane, an advanced practice registered nurse, since 2018. Since moving to Connecticut, the petitioner has been deployed twice—once in 2017 and once in 2019—both times for a period of approximately six months.

In February, 2018, the petitioner filed a motion in Connecticut for modification of the custody and visitation order. A hearing on the motion was held at the Superior Court in the judicial district of New London

at Norwich on March 29, 2018,[4] at which the respondent was not present.[5] In a written order, the court found that the respondent had actual notice of the proceeding but had elected not to appear. The court ordered that "[the petitioner] shall maintain sole legal and physical custody of the minor child Delilah . . . . [The respondent] shall have access at the [petitioner's] discretion following proof of substance abuse counseling, completion of a parenting course and reunification therapy." When this court order was issued, Delilah was six years old.

On March 25, 2019, the petitioner filed the petition to terminate the parental rights of the respondent in the New London Regional Children's Probate Court. At the time the petition was filed, Delilah was seven years old. In the petition, the petitioner alleged: (1) no ongoing parent-child relationship existed between the respondent and Delilah pursuant to § 45a-717 (g) (2) (C); (2) the respondent had abandoned Delilah pursuant to § 45a-717 (g) (2) (A); and (3) the respondent had failed to rehabilitate herself pursuant to § 45a-717 (g) (2) (D) (i).

A Probate Court study for termination of parental rights (study) was completed on June 13, 2019, by Marcus Hilario, a social worker for the Department of Children and Families (department). The study recommended that the parental rights of the respondent be terminated with respect to Delilah. On January 14, 2020, Hilario completed an addendum to the study (addendum). The addendum also recommended that the respondent's parental rights be terminated.

The petition was transferred to the Superior Court for Juvenile Matters at Waterford. The respondent contested the petition, and a trial was held on April 1, 2021.[6] Delilah was nine years old at the time of trial. At the start of trial, counsel for the petitioner withdrew the failure to rehabilitate ground. The court then heard testimony from the petitioner, the respondent, Sara G., and Hilario. Six exhibits were entered into evidence by the petitioner, and five exhibits were entered into evidence by the respondent.[7]

In its memorandum of decision dated July 28, 2021, the court found that the petitioner had proven, by clear and convincing evidence, the grounds of no ongoing parent-child relationship pursuant to § 45a-717 (g) (2) (C) and abandonment pursuant to § 45a-717 (g) (2) (A). The court, thus, terminated the parental rights of the respondent as to Delilah, and this appeal followed.

On appeal, the respondent claims that the court improperly determined that (1) there was no ongoing parent-child relationship between her and Delilah pursuant to § 45a-717 (g) (2) (C); and (2) she had abandoned Delilah pursuant to § 45a-717 (g) (2) (A).

Before considering those claims, we begin by setting

forth the legal principles and standards of review that govern our analysis. "[Section] 45a-715 (a) (2) permits a child's guardian, among others, to petition the Probate Court to terminate the parental rights of that child's parent(s). In order to terminate a parent's parental rights under § 45a-717, the petitioner is required to prove, by clear and convincing evidence, that any one of the seven grounds for termination delineated in § 45a-717 (g) (2) exists and that termination is in the best interest of the child. . . . Those seven grounds are: abandonment, acts of parental commission or omission, no ongoing parent-child relationship, neglect/abuse, failure to rehabilitate, causing the death of another child, or committing a sexual assault that results in the conception of the child." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Jacob W.*, 178 Conn. App. 195, 203–204, 172 A.3d 1274 (2017), aff'd, 330 Conn. 744, 200 A.3d 1091 (2019).

"Nonconsensual termination proceedings involve a two step process: an adjudicatory phase and a dispositional phase. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental rights is in the best interests of the child. . . . The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Alissa N.*, 56 Conn. App. 203, 207–208, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). Section 45a-717 (i) requires the court, in all cases except those in which termination is based on consent, in determining whether termination is in the child's best interest, to consider and make written findings regarding six separate factors.[8]

Our Supreme Court has cautioned that, "[i]n interpreting the parameters of [§ 45a-717 (g)], we must be mindful of what is at stake. [T]he termination of parental rights is defined, in [what is now General Statutes § 45a-707 (8)], as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and [the] parent . . . . It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection." (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 756, 200 A.3d 1091 (2019); see also *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d

1313 (1983) (noting that "it is both a fundamental right and the policy of this state to maintain the integrity of the family"). "Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." (Internal quotation marks omitted.) *In re Jessica M.*, 217 Conn. 459, 465, 586 A.2d 597 (1991).

"Section [45a-717 (g)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent." (Internal quotation marks omitted.) *In re Oreoluwa O.*, 321 Conn. 523, 532, 139 A.3d 674 (2016). "[The petitioner], in petitioning to terminate those rights, must allege and prove [by clear and convincing evidence] one or more of the statutory grounds." (Internal quotation marks omitted.) *In re Michael M.*, 29 Conn. App. 112, 118, 614 A.2d 832 (1992). "Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *In re Carla C.*, 167 Conn. App. 248, 258, 143 A.3d 677 (2016). "In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Michael M.*, supra, 118.

On appeal, we review the court's conclusion that a ground for termination of parental rights has been proven for sufficiency of the evidence. See, e.g., *In re Tresin J.*, 334 Conn. 314, 322, 222 A.3d 83 (2019) ("Although the trial court's subordinate factual findings are reviewable only for clear error, the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. . . . That conclusion is drawn from both the court's factual findings and its weighing of the facts in considering whether the statutory ground has been satisfied. . . . On review, we must determine whether the trial court could have reasonably con-

cluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.)); see also *In re Mariana A.*, 181 Conn. App. 415, 428, 186 A.3d 83 (2018) ("In an appeal from the granting of a petition [to terminate parental rights], our Supreme Court has indicated that the court's ultimate conclusion as to whether a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. . . . Thus, in reviewing the granting of a petition, we must determine whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]." (Citations omitted; internal quotation marks omitted.)).

To the extent we are required to construe the terms of a ground for termination of parental rights or its applicability to the facts of the case, however, our review is plenary. See, e.g., *In re Tresin J.*, supra, 334 Conn. 322; see also *In re November H.*, 202 Conn. App. 106, 132, 243 A.3d 839 (2020) ("[t]he applicability of the interference exception under the facts of this case presents a question of law over which we exercise plenary review").

Last, to the extent that we are required to review the court's subordinate factual findings, we apply the clearly erroneous standard of review. See, e.g., *In re Jacob W.*, supra, 330 Conn. 754 (explaining that applicable standard of review for subordinate factual findings is clear error). "A [subordinate factual] finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re November H.*, supra, 202 Conn. App. 123. With these legal principles in mind, we turn to the respondent's claims.

The respondent claims that there is insufficient evidence in the record to support the court's conclusion that there was no ongoing parent-child relationship between her and Delilah pursuant to § 45a-717 (g) (2) (C). Specifically, the respondent claims that the court improperly concluded that the petitioner had estab-

lished the ground of no ongoing parent-child relationship by clear and convincing evidence because (1) Delilah has present positive memories of her, (2) the petitioner interfered with her relationship with Delilah, and (3) allowing additional time for the reestablishment of the parent-child relationship would not be detrimental to Delilah's best interests. We address each of the respondent's claims in turn.[9]

I

We begin with the respondent's claim that the court improperly granted the petition to terminate her parental rights pursuant to § 45a-717 (g) (2) (C) because Delilah has present positive memories of her.

The following additional procedural history is relevant to our resolution of the respondent's claim. Evidence relating to whether Delilah has present positive memories of the respondent was presented at trial. This evidence includes the testimony of Hilario, the petitioner, Sara G., and two exhibits—the study and addendum—both composed by Hilario.

At trial, Hilario testified as to his interactions with Delilah. Hilario had interviewed Delilah alone on two separate occasions—once in preparation for composing the study and again in preparation for composing the addendum. According to Hilario, Delilah "had very few memories of [the respondent]." At trial, when asked whether Delilah had made any statements regarding any positive memories of the respondent, Hilario responded, "[n]o."

In the study, Hilario reported that he conducted a visit to Delilah's home on May 29, 2019. During this visit, he conducted an interview of Delilah alone. Consistent with his trial testimony, Hilario noted in his study that, during the interview, "Delilah referred to [the respondent] as her father's sister. Delilah reported that she saw [the respondent] a long time ago, but could not remember a time frame. Delilah indicated that [the respondent] was mean and one time pushed [the petitioner] down some stairs. Delilah stated that she could not remember other mean things that [the respondent] did." Hilario also had spoken with Delilah's counselor, Lane, on June 10, 2019, in preparation for composing the study. According to the study, "Lane indicated that Delilah briefly stated that [the respondent] hit her in the face with a hairbrush, however, Delilah did not disclose any further details and did not have a time frame as to when this happened." Hilario testified at trial that Lane had informed him that "Delilah had some memories of [the respondent], I believe, like getting hit in the face with a brush . . . ."

During Hilario's second interview with Delilah, the two again discussed the respondent. When Hilario asked Delilah if she knew who the respondent was, the addendum notes that Delilah stated that "[the respon-

dent] is my other mother." (Internal quotation marks omitted.) Hilario wrote in the addendum, "Delilah reported that [the respondent] pushed [the petitioner] down a flight of stairs but did not have a time frame as to when this incident occurred. Delilah also stated that [the respondent] gave her a lot of toys and a bloody something when she was a baby. Delilah did not provide further details as to what the bloody something was. Delilah stated that she last spoke to [the respondent] when she was six years old on mommy's phone (referring to [Sara G.]). Delilah did not have a time frame as to when she last visited with [the respondent] but indicated that [she] lived in another state." (Internal quotation marks omitted.) Hilario testified at trial that Delilah "remembered [the respondent] giving her a bloody something but then had no details after that." The addendum further stated that Lane had reported to Hilario that Delilah does not discuss the respondent with her. According to Hilario's testimony, "[Lane] reported that the topic of [the respondent] was not discussed."

The petitioner also testified at trial. According to his testimony, while he and the respondent were living in San Diego, the respondent had pushed him down a flight of stairs in the presence of Delilah. Sara G. also testified at trial. She averred that, during one therapy session in which she was present, Delilah told her therapist that "[the respondent] was mean to her, and that [the respondent] had hit her in the mouth with [a] hairbrush and made her mouth bleed and then took her to the store to buy her toys. And then, after that incident, she refused to talk about anything related to [the respondent]."

The petitioner further testified that, after he moved with Delilah to Connecticut in 2017, "[t]here was one phone call in which [the respondent] spoke with Delilah, and it was for approximately thirty seconds." At the time, the petitioner was on deployment, and so the phone call was facilitated by Sara G. The petitioner testified that, while he was deployed, he would leave a cell phone at his home and Sara G. would check the phone at least once a week. The petitioner testified that, on one occasion, Sara G. had allowed the respondent to speak by phone with Delilah in a call that lasted for thirty seconds. The petitioner testified that the call lasted only thirty seconds because "Delilah did not know who she was talking to and, after a brief conversation, said okay, goodbye grandma or I love you, too, grandma." Sara G. similarly reported that, after the respondent had sent a text message to the petitioner's phone on Delilah's birthday requesting to speak with Delilah, the respondent and Delilah spoke by phone for thirty seconds. When asked why the phone call was so short, Sara G. testified: "I couldn't tell you why. I gave the phone to Delilah. [The respondent] told her happy birthday and that she loved her, and—then Delilah said

goodbye, and at the end of the phone call she said, I love you, grandma, and handed the phone back."

On the basis of the evidence presented at trial, the court found the following facts in its memorandum of decision: "Delilah refers to [the respondent] as her 'other mother.' Delilah reported [that] she remembers [the respondent] pushing [the petitioner] down a flight of stairs but does not have a time frame and that [the respondent] gave her a lot of toys and a 'bloody something' when she was a baby. Delilah also remembers talking to [the respondent] on 'mommy's phone,' referring to Sara G.'s phone, when she was six years old. Delilah ended the call saying goodbye to 'grammy.' . . . Delilah has not had an in-person visit with [the respondent] since 2017, and therefore no relationship that ordinarily develops as a result of the parent having met the physical, emotional, moral and educational needs of the child. Delilah does not recognize [the respondent's] voice on the phone and refers to her as her 'other mother.' Delilah has no relationship with [the respondent]." On the basis of these factual findings, the court concluded that "Delilah has no present positive memories of [the respondent], and her memories are not of pleasant things."

On appeal, the respondent contends that there is insufficient evidence in the record to support the court's conclusion that Delilah does not have present positive memories of the respondent. We disagree.

Section 45a-717 (g) provides in relevant part: "[T]he court may approve a petition terminating the parental rights . . . if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) . . . (C) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child . . . ." Our Supreme Court has "explained that the inquiry under § 45a-717 (g) (2) (C) is a two step process. First, the court must determine whether the petitioner has proven the lack of an ongoing parent-child relationship. Only if the court answers that question in the affirmative may it turn to the second part of the inquiry, namely, whether allowance of further time for the establishment or reestablishment of the relationship would be contrary to the child's best interests." (Internal quotation marks omitted.) *In re Jacob W.*, supra, 330 Conn. 755.

This statutory ground for termination of an individual's parental rights was created via No. 74-164, § 6, of the 1974 Public Acts (P.A. 74-164) and was intended to be a "no-fault" statutory ground for termination. See *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648,

669, 420 A.2d 875 (1979) (referring to no ongoing parent-child relationship ground for termination of parental rights as " 'no-fault' statutory ground"); see also *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 645, 436 A.2d 290 (1980) ("[i]t is clear that the legislature intended that even without fault on the part of the parent a child should be able to be freed for adoption where there is no ongoing child-parent relationship and where the period of time predictably necessary to establish or reestablish a parent-child relationship with the natural parent would be detrimental to the child's best interest"). The prior version of the statute, enacted into law by No. 73-156, § 7, of the 1973 Public Acts, allowed petitions for the termination of parental rights to be filed in the Probate Court, in the absence of consent, based only on certain "fault" grounds such as abandonment, neglect, or physical or mental disability. Probate Judge Glenn Knierim, head of the committee of probate judges and clerks, and a representative of the then Welfare Department, drafted P.A. 74-164. Judge Knierim explained at the March 19, 1974 hearing before the legislature's Joint Standing Committee on the Judiciary that the no ongoing parent-child relationship ground for termination "allows [a] judge to terminate parental rights if [the court] believes that no parent/child relationship exists and [that] to allow time to [develop] such a relationship would be detrimental [to] the child." Conn. Joint Standing Committee Hearings, Judiciary, 1974 Sess., p. 195, remarks of Judge Knierim.

Since its creation in 1974, this statutory ground for termination "has evolved in light of a sparse legislative history . . . ." (Internal quotation marks omitted.) *In re Jacob W.*, supra, 178 Conn. App. 208. "In its interpretation of the language of § 45a-717 (g) (2) (C), this court has been careful to avoid placing insurmountable burden[s] on noncustodial parents. . . . Because of that concern, [our Supreme Court has] explicitly rejected a literal interpretation of the statute, which defines the relationship as one that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." (Internal quotation marks omitted.) *In re Jacob W.*, supra, 330 Conn. 757. Rather, our Supreme Court has explained that "[i]t is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. In either case the . . . question is whether the child has no present memories or feelings for the natural parent."[10] *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 670.

The term "for," as used in the phrase "present memories or feelings for the natural parent," has been inter-

preted to mean "what is said or felt in favor of someone or something: pro." (Internal quotation marks omitted.) *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). Thus, "the phrase 'feelings for the natural parent' refers to feelings of a positive nature. It does not encompass . . . extreme, psychologically corrosive and destructive feelings . . . ." Id.; see also *In re Jessica M.*, supra, 217 Conn. 470 ("[T]he standard contemplates a relationship that has some positive attributes. It is not unlikely that most parent-child relationships in which state intervention is required, including custody disputes incidental to divorce, will exhibit signs of strain. While evidence of a child's ambivalent feelings toward a noncustodial parent would not alone justify a finding that no ongoing parent-child relationship exists, it is nevertheless reasonable to construe this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive." (Internal quotation marks omitted.)).

Thus, our case law makes clear that the test for determining whether an ongoing parent-child relationship exists is whether the "child [has] some present memories or feelings for the natural parent that are positive in nature." (Internal quotation marks omitted.) Id., 469; see also *In re Tresin J.*, supra, 334 Conn. 325 ("[t]he ultimate question is whether the child has some present memories or feelings for the natural parent that are positive in nature" (emphasis omitted; internal quotation marks omitted)); *In re Jacob W.*, supra, 330 Conn. 757 (same); *In re Emily S.*, Superior Court, judicial district of New Britain, Juvenile Matters, Docket No. CP-18-012507-A (April 22, 2001) (same) (reprinted at 210 Conn. App. 585, 613, 270 A.3d 819), aff'd, 210 Conn. App. 581, 270 A.3d 797, cert. denied, 342 Conn. 911, 271 A.3d 1039 (2022). "[T]he . . . question is whether the child has no present [positive] memories or feelings for the natural parent." (Internal quotation marks omitted.) *In re Carla C.*, supra, 167 Conn. App. 266; see also *In re Jonathon G.*, 63 Conn. App. 516, 525, 777 A.2d 695 (2001) ("[f]eelings for the natural parent connotes feelings of a positive nature only" (internal quotation marks omitted)); *In re John G.*, 56 Conn. App. 12, 23, 740 A.2d 496 (1999) (same); *In re Tabitha T.*, 51 Conn. App. 595, 602, 722 A.2d 1232 (1999) (same); *In re Kezia M.*, 33 Conn. App. 12, 21, 632 A.2d 1122 (same), cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

Our Supreme Court has also clarified that "[d]ay-to-day absence alone . . . is insufficient to support a finding of no ongoing parent-child relationship" and has "rejected the notion that termination may be predicated on the lack of a *meaningful* relationship, [because] the statute requires that there be *no* relationship." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re Jacob W.*, supra, 330 Conn. 757–58. It thus follows that, "evidence of a troubled parent-child

relationship [is], without more, insufficient to justify termination on the basis of no ongoing parent-child relationship . . . ." (Internal quotation marks omitted.) *In re Jessica M.*, supra, 217 Conn. 469–70; see also *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 671 ("[t]he statute does not authorize the termination of parental rights upon a showing of a troubled relationship, but only upon a showing of no relationship").

The statute also does not authorize a court to terminate parental rights simply because the biological parent is not the "psychological parent" of the child, as such authorization would place an insurmountable burden on noncustodial parents. See *In re Jessica M.*, supra, 217 Conn. 470 ("If a court were authorized to find that day-to-day absence alone proved that no ongoing parent child relationship existed, a parent whose child needed a temporary placement would otherwise have to consider the risk that his or her parental rights might be terminated if the guardian subsequently wished to adopt. Such a standard for termination would create an incentive for a parent to yield temporary custody to a stranger rather than to an interested relative who might develop a strong bond with the child. Creating a disincentive for a parent to choose the guardian most likely to love and protect the child while the parent was unable to provide daily care would contravene the state's interests in protecting both family integrity and the best interests of the child." (Footnote omitted; internal quotation marks omitted.)); *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 675 ("The fact that the child may have established a loving relationship with someone besides [the parent] does not prove the absence of a [parent-child] relationship. It is insufficient to prove that the child has developed emotional ties with another person. Certainly children from two-parent homes may have two psychological parents; even children whose parents are divorced may retain close emotional ties to both, although the relationship to one is maintained solely through visitation. . . . The statute, however, quite clearly does not authorize termination upon a showing of no meaningful relationship, but rather requires that there be no relationship." (Emphasis omitted; internal quotation marks omitted.)).

As to noncustodial parents, our Supreme Court has emphasized that "[t]he evidence regarding the nature of the respondent's relationship with [the] child at the time of the termination hearing must be reviewed in the light of the circumstances under which visitation had been permitted." *In re Jessica M.*, supra, 217 Conn. 473. The fact that a noncustodial parent has had some contact with the child, however, does not "preclude a determination that there [is] no ongoing parent-child relationship . . . ." *In re Juvenile Appeal (Anonymous)*, supra, 181 Conn. 646.

In the present case, the respondent argues that the

court's conclusion that Delilah has no present positive memories of her is "belied by the substantial record evidence that Delilah has many present positive memories of [her]."[11] In support of this contention, the respondent relies on the following evidence: (1) when asked by Hilario if she knew who the respondent was, Delilah stated that the respondent was her " 'other mother,' " (2) Delilah did not have a time frame as to when she last visited with the respondent but indicated that they lived in another state, (3) Delilah stated that she last spoke with the respondent when she was six years old on " 'mommy's phone' " (referring to Sara G.), (4) Delilah sometimes discusses her memories of the respondent with Lane but with no contexts or time frames, and (5) Delilah stated that the respondent gave her a lot of toys. We address each piece of evidence in turn.

As previously explained, in his addendum, Hilario reported that, during his second interview with Delilah, he had asked her if she knew who the respondent was, and she stated that "[the respondent] is my other mother." (Internal quotation marks omitted.) The respondent asserts that this evidence supports the conclusion that Delilah has present positive memories of her. We are unpersuaded.

That Delilah may recognize the respondent as her " 'other mother' " is not evidence of a present positive memory of the respondent. The statement simply indicates that Delilah may recognize who the respondent is, not that she has any present memories of the respondent that are positive in nature. Our case law instructs that "[t]he ultimate question is whether the child has some present memories or feelings for the natural parent that are positive in nature."[12] (Emphasis omitted; internal quotation marks omitted.) *In re Tresin J.*, supra, 334 Conn. 325. Thus, the respondent's reliance on Delilah's statement that the respondent is her " 'other mother' " does not support her assertion that Delilah has present positive memories of her.[13]

The addendum composed by Hilario also provided that "Delilah did not have a time frame as to when she had last visited with [the respondent] but indicated that they lived in another state." This evidence likewise cannot reasonably be construed to be a present positive memory. The evidence merely suggests that Delilah could not remember when the respondent had visited her last but that Delilah knew that the respondent lived in a different state. Nothing in this evidence indicates that Delilah has some present memories or feelings toward the respondent that are positive in nature. We, therefore, find the respondent's reliance on this evidence misplaced.

Hilario also reported in his addendum that Delilah stated that she last spoke with the respondent when she was six years old on " 'mommy's phone' " (referring

to Sara G.).[14] Again, there is no evidence in the record that this memory is positive in nature. We, thus, find unavailing the respondent's contention that Delilah has a present positive memory of her last phone call with the respondent.

Similarly, evidence that Delilah "sometimes discusses her memories of [the respondent] with [Lane] but with no contexts or time frames" does not support the respondent's contention that Delilah has present positive memories of her because there is no evidence in the record as to whether these memories are positive in nature.

Last, the respondent relies on evidence that "Delilah also stated that [the respondent] gave her a lot of toys . . . ." The respondent argues that "Delilah reveals that she has a present memory that [the respondent] gave her a lot of toys" and that, "[u]ndoubtedly, this is a present positive memory of [the respondent]." The respondent acknowledges, however, that "in this same sentence, Delilah also recalled that [the respondent] gave her a 'bloody something,' although the child did not provide any clarifying details regarding this memory." The respondent isolates Delilah's statements and argues that "some of Delilah's memories of [the respondent] are positive while others are ambiguous or negative. The mere fact that some of Delilah's memories of [the respondent] are ambiguous or negative does not vitiate the fact that she has many present positive memories of [the respondent]."

Although we agree with the respondent's contention that not all of a child's memories of the parent must be positive in order for the court to conclude that there is an ongoing parent-child relationship, we emphasize that at least some of the child's present memories or feelings of the parent must be positive in nature. See, e.g., *In re Jessica M.*, supra, 217 Conn. 470 ("[T]he standard contemplates a relationship that has some positive attributes. It is not unlikely that most parent-child relationships in which state intervention is required, including custody disputes incidental to divorce, will exhibit signs of strain. While evidence of a child's ambivalent feelings toward a noncustodial parent would not alone justify a finding that no ongoing parent-child relationship exists, it is nevertheless reasonable to construe this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive." (Internal quotation marks omitted.)).

When we review in context Delilah's statement that "[the respondent] gave her a lot of toys and a 'bloody something' when she was a baby," we conclude that it cannot reasonably be construed as a positive memory. Hilario testified that Lane told him that "Delilah had some memories of [the respondent], I believe, like getting hit in the face with a brush . . . ." Sara G. likewise

averred that, during one therapy session in which she was present, Delilah told her therapist that "[the respondent] was mean to her, and that [the respondent] had hit her in the mouth with [a] hairbrush and made her mouth bleed and then took her to the store to buy her toys. And then, after that incident, she refused to talk about anything related to [the respondent]." Hilario also reported in both his study and addendum that Delilah indicated that the respondent was mean, and, at some point, had pushed the petitioner down some stairs. The petitioner also testified that, while he and the respondent were living in San Diego, the respondent had pushed him down a flight of stairs in the presence of Delilah. We, therefore, conclude that this evidence does not demonstrate that Delilah has a present positive memory of the respondent.

Our careful review of the record leads us to conclude that the court could have reasonably concluded, on the basis of the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its conclusion that Delilah has no present positive memories of the respondent. Accordingly, we will not disturb this conclusion.

II

The respondent next claims that the court erred in concluding that the interference exception did not apply to preclude the petitioner from relying on § 45a-717 (g) (2) (C) as a ground for termination. We disagree.

The following additional procedural history is pertinent to our analysis of this claim. At the trial on the petition to terminate the respondent's parental rights, the respondent argued that the interference exception should apply and prohibit the petitioner from relying on the lack of an ongoing parent-child relationship between her and Delilah. In support of this argument, the respondent relied on certain evidence presented at trial. For example, evidence was presented that the petitioner had filed a motion to modify the visitation order, resulting in a court order, dated March 29, 2018, providing that the respondent would be permitted to visit Delilah "at the [petitioner's] discretion following proof of substance abuse counseling, completion of a parenting course and reunification therapy." Evidence also was presented regarding a request made by the respondent to visit with Delilah in March, 2018, and the petitioner's corresponding refusal to permit such a visit based on his contention that it was not the respondent's visitation time. Testimony was heard regarding the petitioner's deployments and the respondent's ability to contact Delilah during those deployments. Evidence also was admitted concerning whether the respondent had the petitioner's address in Connecticut in order to send cards and gifts to Delilah and whether the petitioner refused to provide the respondent with his

address. In his closing argument, the respondent's counsel argued that this evidence showed that the petitioner had interfered with the respondent's relationship with Delilah.

In its memorandum of decision, the court concluded that the interference exception did not apply to the facts of the case. The court found that the respondent's claims that the petitioner had interfered with her ability to maintain an ongoing relationship with Delilah were not credible. The court noted that it had taken into consideration the petitioner's 2017 and 2019 deployments and the effect that they may have had on the respondent's ability to visit with Delilah. The court also pointed out that it had considered the respondent's assertion that she did not have the petitioner's address, which, she claimed, prevented her from contacting Delilah and filing anything with the court. The court found that this assertion was not credible and determined that the respondent had been provided the petitioner's new address in 2017. Last, the court concluded that "the fact that [the petitioner] has taken a hard line, requiring [the respondent] to abide by the court orders does not rise to the level of interference. The exchange of text messages between [the respondent] and [the petitioner] in 2018 . . . highlights [the petitioner's] frustration and concerns of accommodating the respondent's efforts to see her child. The text messages indicate [that the respondent] had previously indicated she had planned to see the child but did not follow through. [The petitioner] expressed his concerns over [the respondent's] not having a [driver's] license and the possible exposure of his child to a stranger. [The petitioner's] insisting [that the respondent] follow the court-ordered visitation schedule under these circumstances was not unreasonable. . . . [The respondent] has done nothing to comply with the court orders or seek to change the orders to be in a position to see her daughter." (Citation omitted.)

We begin our analysis by briefly setting forth the case law regarding what has become known as the "interference exception" to the no ongoing parent-child relationship ground for termination. Recently, in *In re Jacob W.*, supra, 330 Conn. 754–69, our Supreme Court clarified the parameters of the interference exception. The interference exception, the court explained, "applies when the petitioner has engaged in conduct that inevitably has led to the lack of an ongoing parent-child relationship between the respondent parent and the child. This exception precludes the petitioner from relying on the lack of an ongoing parent-child relationship as a basis for termination. Under these circumstances, even if neither the respondent parent nor the child has present positive feelings for the other and, even if the child lacks any present memories of the respondent parent, the petitioner is precluded from relying on § 45a-717 (g) (2) (C) as a basis for termination." *In re Jacob W.*, supra, 763–64. The "inquiry prop-

erly focuses not on the petitioner's intent in engaging in the conduct at issue, but on the consequences of that conduct. In other words, the question is whether the petitioner engaged in conduct that inevitably led to a noncustodial parent's lack of an ongoing parent-child relationship. If the answer to that question is yes, the petitioner will be precluded from relying on the ground of no ongoing parent-child relationship as a basis for termination regardless of the petitioner's intent—or not—to interfere." (Internal quotation marks omitted.) Id., 762.

Further clarification of the interference exception was provided in *In re Tresin J.*, supra, 334 Conn. 331–33. The court in that case opined that "the interference exception is akin to the equitable doctrine of clean hands . . . ." (Internal quotation marks omitted.) Id., 332. It also made clear that the interference exception "is triggered only by the conduct of the petitioner rather than that of a third party or some other external factor that occasioned the separation." Id. Then, the court explained that "[t]he interference exception . . . applies when the actions of the petitioner rendered inevitable the initial lack of a relationship . . . ." (Emphasis omitted.) Id., 332 n.12.

Our cases involving the interference exception demonstrate that the exception does not apply if the actions of the petitioner do not inevitably lead to the lack of a relationship between the respondent and the child. Compare id. (interference exception was inapplicable where actions of petitioner did not render inevitable lack of relationship between incarcerated respondent father and child because lack of relationship occurred several years before alleged interference by petitioner), and *In re November H.*, supra, 202 Conn. App. 134 (same), and *In re Alexander C.*, 67 Conn. App. 417, 424–25, 787 A.2d 608 (2001) (interference exception was inapplicable because, although child was placed in foster care within days of birth, incarcerated respondent father, rather than petitioner, created circumstances that caused and perpetuated lack of ongoing parent-child relationship and because respondent made no attempt to modify protective order barring contact with child, which did not require extraordinary and heroic efforts by respondent), aff'd, 262 Conn. 308, 813 A.2d 87 (2003), with *In re Valerie D.*, 223 Conn. 492, 531–35, 613 A.2d 748 (1992) (interference exception was applicable where department took temporary custody of child essentially upon birth and termination hearing took place only few months later because finding of lack of ongoing parent-child relationship was inevitable in absence of extraordinary and heroic efforts by incarcerated respondent mother), and *In re Carla C.*, supra, 167 Conn. App. 276 (interference exception was applicable because, short of extraordinary and heroic efforts by incarcerated respondent father, who had filed numerous contempt motions in attempt to

enforce visits with child, petitioner mother was able to completely deny father access to child by obtaining order from prison precluding him from initiating communication with her and child, discarding letters he sent to child and filing motion to suspend child's visitation with father). Consequently, the respondent has the burden of proving that the *petitioner's* interference and conduct *caused* her initial lack of relationship with her child.

In the present case, the respondent contends that the interference exception should apply to preclude the petitioner from relying on the ground of no ongoing parent-child relationship to terminate her parental rights because, according to the respondent, the petitioner engaged in conduct that inevitably led to her lack of an ongoing parent-child relationship with Delilah. Specifically, the respondent contends that the petitioner interfered with her relationship with Delilah by (1) obtaining the March 29, 2018 court order effectively barring her from having any visits with Delilah,[15] (2) refusing to allow the respondent to visit Delilah when she traveled to Connecticut in March, 2018, (3) leaving the respondent with "virtually no way to contact [the petitioner] to arrange visits or speak with Delilah" during the petitioner's 2017 and 2019 deployments, and (4) refusing to provide the respondent with his address.[16] We address each instance of alleged interference in turn and conclude that the actions of the petitioner did not inevitably lead to the lack of an ongoing parent-child relationship between the respondent and Delilah. Cf. *In re Jacob W.*, supra, 330 Conn. 763 ("[t]he [interference] exception . . . applies when the petitioner has engaged in conduct that inevitably has led to the lack of an ongoing parent-child relationship between the respondent parent and the child").

The respondent first contends that the petitioner's procurement of the March 29, 2018 court order inevitably led to the lack of an ongoing parent-child relationship between her and Delilah. As previously described, the March 29, 2018 court order provides that "[the petitioner] shall maintain sole legal and physical custody of the minor child Delilah . . . . [The respondent] shall have access at the [petitioner's] discretion following proof of substance abuse counseling, completion of a parenting course and reunification therapy." According to the respondent, the order "effectively barred [her] from having *any* visits with Delilah" because, "even if [she] completed these services, the [petitioner] would still have unfettered discretion to deny visitation . . . for any reason, or for no reason at all." (Emphasis added.) We are not persuaded that the March 29, 2018 court order required " 'extraordinary and heroic efforts' " by the respondent in order to maintain an ongoing parent-child relationship with Delilah. *In re Carla C.*, supra, 167 Conn. App. 273. We find it significant that, unlike in *In re Carla C.*, the order did not

bar the respondent from visiting with Delilah, speaking with her by phone, or sending her letters or gifts in the mail. See id., 253–56 (lack of ongoing parent-child relationship was inevitable where petitioner mother obtained order from prison in which respondent father was incarcerated barring him from all oral or written communication with her and child, discarded cards and letters he sent to child and obtained court order suspending his visitation with child pending outcome of proceedings on petition to terminate father's parental rights). Furthermore, the respondent produced no credible evidence that she engaged in the services prescribed by the court order or sought to modify the order prior to the filing of the termination petition. Compare id., 273 (interference exception applied where respondent filed number of motions for contempt against petitioner seeking to enforce his visitation time with child because, "short of extraordinary and heroic efforts by the respondent . . . petitioner was able to completely deny him access to [child]" (internal quotation marks omitted)), with *In re Alexander C.*, supra, 67 Conn. App. 425 (interference exception did not apply where respondent made no attempt to modify court order prohibiting him from contacting child to one of supervised visitation, as it did not require extraordinary and heroic effort to take affirmative step of attempting to modify protective order). We are also unpersuaded by the respondent's attempt to equate the petitioner's insistence that the respondent abide by the court order with the respondent's actions in *In re Carla C.*, supra, 273. In *In re Carla C.*, the respondent refused to facilitate visits with the petitioner as required by the court's custody order and never told the minor child that the petitioner was her father or showed her photographs of the petitioner. See id. There is no evidence in the present case that the petitioner engaged in any such conduct.

We also disagree with the respondent's assertion that the petitioner interfered with her relationship with Delilah by refusing to let her visit with Delilah when she was in Connecticut in March, 2018. The court, in its memorandum of decision, found that, in refusing to permit visitation on this particular occasion, it was not unreasonable for the petitioner to insist that the respondent follow the court-ordered visitation schedule that was in place at the time. In so doing, the court specifically acknowledged the petitioner's concerns and frustrations over the respondent's failure to follow through with previously planned visits, her lack of a driver's license and possible exposure of his child to a stranger. Because she failed to follow the court-ordered visitation schedule, we find unavailing the respondent's assertion that the petitioner interfered with her ability to have and maintain a relationship with Delilah.

The respondent also contends that the petitioner interfered with her relationship with Delilah because, "when the [petitioner] was deployed at sea for six

months in 2017 and again in 2019, [she] had virtually no way to contact the [petitioner] to arrange visits or speak with Delilah." The court specifically noted that it had taken into consideration the petitioner's 2017 and 2019 deployments and the effect they may or may not have had on her ability to visit with Delilah and found that her claims were not credible.

Last, the respondent argues that, by refusing to provide her with his address, the petitioner interfered with her ability to maintain an ongoing parent-child relationship with Delilah. In her reply brief, the respondent contends that "the trial court's finding that [the respondent] lacked credibility when she testified that the [petitioner] refused to provide her with his address is clearly erroneous." The court, however, explained that it had "considered the [respondent's] claim that she did not have [the petitioner's] address in order to contact the child or the ability to file anything in court concerning the child and further finds those claims not creditable. [The respondent] was provided with [the petitioner's] new address in 2017." An email from the petitioner to the respondent, dated July 14, 2017, was entered into evidence at trial. In the email, the petitioner informed the respondent of his new address. Thus, because there is evidence in the record to support the court's factual finding, we will not disturb this finding on appeal. See *In re Jacob W.*, supra, 330 Conn. 770 ("Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.)).

While we reiterate that the court did not find credible the evidence the respondent proffered in support of her interference claims, we also observe that the respondent presented no evidence whatsoever with respect to the quality and nature of her relationship with Delilah *before* the petitioner allegedly sought to interfere with it. Unlike the respondents in *In re Valerie D.* and *In re Carla C.*, who did not have a fair opportunity to begin and develop a relationship with their child, the respondent had custody of Delilah for the first three years of her life, had court-ordered visitation in the years since the original judgment transferred custody to the petitioner and the opportunity to maintain contact and a relationship through telephone calls, letters and gifts, even after she moved to California in 2018. Moreover, the court specifically found that the respondent made minimal effort to maintain a relationship with Delilah, a finding that is supported by the petitioner's testimony that the respondent had failed to follow through with scheduled visitations and, by 2018, had attempted only once to schedule a visit with Delilah.

We conclude that the respondent has failed to meet her burden of showing that the actions of the petitioner rendered inevitable the lack of a relationship between her and Delilah. As the court found by clear and convincing evidence, there was minimal effort on the respondent's part to maintain a relationship with the child. See *In re Alexander C.*, supra, 67 Conn. App. 424 ("[T]he respondent, rather than the [petitioner], created the circumstances that caused and perpetuated the lack of an ongoing relationship between the respondent and [the child]. . . . It was the respondent's action, which resulted in his incarceration, that occasioned his separation from the child." (Citation omitted.)).

In light of the court's conclusion that the respondent made minimal efforts to maintain a relationship with Delilah and because the respondent failed to prove that the petitioner's conduct, rather than her own conduct, rendered inevitable the lack of a relationship between her and Delilah, we conclude that the court properly determined that the interference exception was inapplicable in the present case.

### III

The respondent also argues that the court improperly concluded that allowing additional time for the reestablishment of the parent-child relationship would be detrimental to Delilah's best interests. We disagree.

In its memorandum of decision, the court concluded that further time for the reestablishment of a parent-child relationship between Delilah and the respondent would be detrimental to Delilah's best interests. The court explained: "Delilah has no present positive memories of [the respondent], and her memories are not of pleasant things. Delilah has not had an in-person visit with [the respondent] since 2017, and therefore no relationship that ordinarily develops as a result of the parent having met the physical, emotional, moral and educational needs of the child. Delilah does not recognize [the respondent's] voice on the phone and refers to her as her 'other mother.' Delilah has no relationship with [the respondent]. The [advanced practice registered nurse, Lane], with whom Delilah has received her behavioral treatment since 2018, stated [that] Delilah could experience emotional distress if there is contact between [the respondent] and Delilah because it has been so long since they have seen each other. Therefore, the court also finds by clear and convincing evidence that to allow further time for the reestablishment of the parent-child relationship would be detrimental to the best interests of Delilah."

As previously noted, termination of parental rights pursuant to § 45a-717 (g) (2) (C) requires the court to find that "there is no ongoing parent-child relationship . . . and to allow further time for the establishment or reestablishment of the parent-child relationship would

be detrimental to the best interests of the child . . . ." Thus, this ground for termination "requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists; and second, the court must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop."[17] *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 479, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). "Although a petitioner must establish both prongs by clear and convincing evidence, and, accordingly, a petition may fail under either prong, the inquiries under the two prongs are intertwined. That is, logic dictates that the question of whether it would be detrimental to the children's interests to allow further time for the development of a parent-child relationship will depend to some extent on the findings made and reasoning employed by the trial court in resolving whether there was an ongoing parent-child relationship." *In re Jacob W.*, supra, 330 Conn. 769–70.

In the present case, the respondent argues that the court, in concluding that to allow further time for the reestablishment of the parent-child relationship would be detrimental to Delilah's best interests, improperly relied on Lane's statement that "Delilah could experience emotional distress if there is contact between [her and the respondent] because it has been so long since they have seen each other." Specifically, the respondent contends that Lane's "statement that visitation *could* result in emotional distress is entirely speculative and lacks any probative value. . . . Lane's statement means only that there is a *possibility*, rather than a *probability*, that the child *could* experience distress if she has contact with [the respondent]—in other words, less than a 50-50 chance. . . . Thus, Lane's statement is insufficient to support the trial court's finding that additional time is contrary to Delilah's best interests *by clear and convincing evidence*."[18] (Emphasis in original.) In support of this argument, the respondent relies on *Aspiazu* v. *Orgera*, 205 Conn. 623, 632, 535 A.2d 338 (1987), for the proposition that "[a]ny expert opinion that describes a condition as possible or merely fifty-fifty is based on pure speculation." (Internal quotation marks omitted.)

We note that "[c]ourts are entitled to give great weight to professionals in parental termination cases." (Internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 590, 122 A.3d 1247 (2015). We also note that, in addition to Lane's statement that "Delilah could experience emotional distress if there is contact between [the respondent] and Delilah because it has been so long since they have seen each other," other evidence was admitted at trial that supports the court's conclusion that allowing further time for the development of a parent-child relationship would be contrary to Delilah's

best interests. For example, both the study and the addendum prepared by the department, which were admitted into evidence at trial, recommended that the parental rights of the respondent as to Delilah be terminated and that Sara G. be allowed to adopt Delilah.

Evidence also was presented at trial that Delilah has negative memories of or feelings toward the respondent. See *In re Jacob W.*, supra, 330 Conn. 771–72 (deeming negative feelings that children had expressed toward respondent relevant in determining whether allowing more time to reestablish parent-child relationship would be detrimental to best interests of children). Specifically, evidence was admitted at trial that Delilah had stated that the respondent was mean to her and, at one point, had pushed the petitioner down some stairs. Further evidence indicated that Delilah had reported that the respondent had hit her in the face with a hairbrush and had given her a " 'bloody something' . . . ." According to Sara G.'s testimony, during one therapy session in which she was present, Delilah told her therapist that "[the respondent] was mean to her, and that she had hit her in the mouth with [a] hairbrush and made her mouth bleed . . . ."

The respondent has not claimed or presented evidence that she ever attempted to have the March 29, 2018 order modified, nor has she presented evidence that she sought to comply with the order by engaging in substance abuse counseling, a parenting course, or reunification therapy.[19] See *In re Jacob W.*, supra, 330 Conn. 773 (deeming whether respondent has attempted to modify protective order precluding respondent from visiting children relevant to whether additional time to reestablish parent-child relationship would be detrimental to best interests of children).

Evidence also was presented that, at various times, Delilah has referred to the respondent as her father's sister, her " 'other mother,' " and her grandmother.[20] The court found that Delilah has no relationship with the respondent. Additional evidence was presented that Delilah has resided with the petitioner, Sara G., and her siblings since 2015. Evidence was admitted at trial that the petitioner and Sara G. are meeting Delilah's needs. The court found that Delilah refers to Sara G. as her mother. See *In re Juvenile Appeal (Anonymous)*, supra, 181 Conn. 646 (explaining that because best interests of child are controlling in determining whether to allow time for development of ongoing parent-child relationship, evidence as to child's relationship with foster parents and their availability and suitability as adoptive parents is clearly relevant); see also *In re Jonathon G.*, supra, 63 Conn. App. 526 (deeming fact that child had bonded with his maternal grandparents and was making progress with them relevant in concluding whether it was in child's best interest to allow further time to establish parent-child relationship). Fur-

thermore, "[t]his court has repeatedly recognized that stability and permanence are necessary for a young child's healthy development." (Internal quotation marks omitted.) *In re Jacob W.*, supra, 330 Conn. 774.

We thus conclude, on the basis of our thorough review of the record, that there is sufficient evidence in the record to support the trial court's conclusion that to allow further time for the reestablishment of the parent-child relationship would be detrimental to Delilah's best interests.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** August 24, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Although § 45a-717 (g) was the subject of technical amendments in 2019; see Public Acts 2019, No. 19-189, § 10; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] The respondent also has two children from a previous marriage.

[3] Delilah is the only child born of the petitioner and the respondent's relationship.

[4] Neither the respondent nor the petitioner was represented by counsel during the March 29, 2018 hearing.

[5] At the trial on the petition to terminate the respondent's parental rights, the respondent testified that she was not aware of the March 29, 2018 court date and had learned of the scheduled hearing only after it already had occurred. According to the respondent, she was in Connecticut the week of March 29, 2018, but only to visit Delilah.

In its memorandum of decision, the court found that the respondent's testimony that she was unaware of the court date was not credible given the fact that she " 'just happened' " to be in Connecticut at the time of the hearing. On appeal, the respondent does not contest the propriety of this finding.

[6] Both the petitioner and the respondent were represented by counsel during the trial on the petition to terminate the parental rights of the respondent.

[7] The court also took judicial notice of the New London Regional Children's Probate Court file.

[8] The court must consider: "(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." General Statutes § 45a-717 (i).

[9] The respondent also claims that the court improperly determined, pursu-

ant to § 45a-717 (g) (2) (A), that she had abandoned Delilah. We note that, "[i]n the present case, for the respondent to prevail, [she] must successfully challenge both of the bases of the judgment terminating [her] parental rights. . . . If either of the grounds on which the trial court relied are upheld on appeal, the termination of parental rights must stand." (Citation omitted; internal quotation marks omitted.) *In re Lukas K.*, 120 Conn. App. 465, 484 n.11, 992 A.2d 1142 (2010), aff'd, 300 Conn. 463, 14 A.3d 990 (2011). Because we conclude that the court did not err in terminating the respondent's parental rights based on the lack of an ongoing parent-child relationship between her and Delilah, we do not address whether the court erred in terminating her parental rights based on abandonment.

[10] Although *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 648, concerned General Statutes § 17-43a, the predecessor of General Statutes § 17a-112, rather than § 45a-717, it and other cases concerning § 17a-112 are pertinent to our understanding of § 45a-717. "Because the provisions governing the termination of parental rights under § 17a-112, which governs petitions regarding children previously committed to the custody of the department, and § 45a-717, which is the correspondent statute for proceedings in the Probate Court that governs such petitions brought by private parties . . . are virtually identical, case law applying either statute is instructive in termination of parental rights cases." (Citation omitted; internal quotation marks omitted.) *In re Tresin J.*, supra, 334 Conn. 324 n.8; see also *In re Jessica M.*, supra, 217 Conn. 468 n.6 (explaining that prior cases construing no ongoing parent-child relationship ground for termination found within § 17-43a were applicable to no ongoing parent-child relationship ground for termination found within General Statutes § 45-61f, now codified at § 45a-717, as statutory language is identical and each statute "was enacted by [P.A. 74-164], and nothing in the legislative history suggests that they should be construed differently"); *In re Carla C.*, supra, 167 Conn. App. 257 n.12 ("[t]his court has applied the same analytical framework to petitions to terminate parental rights pursuant to §§ 17a-112 and 45a-717, the relevant language of which is nearly identical" (internal quotation marks omitted)).

[11] The respondent also contends that, by noting that "Delilah has not had an in-person visit with [the respondent] since 2017, and therefore no relationship that ordinarily develops as a result of the parent having met the physical, emotional, moral and educational needs of the child," the trial court ignored our Supreme Court's holding in *In re Jacob W.*, supra, 330 Conn. 757, which explained that the court had "explicitly rejected a literal interpretation of the statute, which defines the relationship as one that ordinarily develops as a result of a parent having met on a continuing day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." (Internal quotation marks omitted.) We disagree.

Although the trial court noted that "no relationship that ordinarily develops as a result of the parent having met the physical, emotional, moral and educational needs of the child" existed between Delilah and the respondent, it went on to conclude in its memorandum of decision that "Delilah has no present positive memories of [the respondent], and her memories are not of pleasant things." Thus, the trial court clearly did not ignore the holding of our Supreme Court in *In re Jacob W.*, as the respondent suggests. See *In re Jacob W.*, supra, 330 Conn. 757 ("The ultimate question is whether the child has some present memories or feelings for the natural parent that are positive in nature. . . . [W]e have explicitly rejected a literal interpretation of the statute, which defines the relationship as one that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child." (Citations omitted; internal quotation marks omitted.)).

[12] The respondent contends that "positive" means "explicitly laid down; express; direct; explicit; precise; specific" or "absolute; real; existing in fact or by the presence of something and not by its absence." We disagree. "Positive," as used in the context of our cases concerning the no ongoing parent-child relationship ground for termination, means "having a good effect . . . favorable" or "marked by optimism." Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/positive (last visited August 19, 2022). For example, in *In re Juvenile Appeal (84-6)*, supra, 2 Conn. App. 709, this court explained that the term "for," as used in the phrase "no present memories or feelings for the natural parent," means "what is said or felt *in favor* of someone or something: pro." (Emphasis added; internal quotation marks omitted.) This court went on to explain that "the phrase 'feelings for the natural parent' refers to feelings

of a positive nature. It does not encompass . . . extreme, psychologically corrosive and destructive feelings." Id. Thus, if "positive" meant "express," "absolute," or "real" as the respondent contends, then "positive feelings" would encompass even psychologically corrosive and destructive feelings. Because this court previously has made clear that such feelings cannot properly be characterized as "positive feelings" necessary to show an ongoing parent-child relationship, we decline to apply the definition of "positive" that the respondent suggests.

[13] The respondent also notes that "there is no evidence that Delilah had any difficulty with the notion that she has two mother figures in her life: [the respondent], her biological mother, and Sara G., her custodial mother. See *In re Caleb P.*, [53 Conn. Supp. 329, 346, 113 A.3d 507 (2014)] (finding that [respondent] father maintained an ongoing parent-child relationship with his child where the child 'did not have any difficulty in the notion that he has two daddies')."

In *In re Caleb P.*, which is not binding precedent on this court, the trial court concluded that the child "ha[d] present memories or feelings for his father. He did not have any difficulty in the notion that he has two daddies." *In re Caleb P.*, supra, 53 Conn. Supp. 346. In the present case, evidence that Delilah acknowledges two mother figures in her life does not obviate the court's conclusion that she has no present positive memories or feelings for the respondent. We, thus, find the respondent's reliance on *In re Caleb P.* unavailing.

[14] Evidence was presented at trial as to a phone conversation between the respondent and Delilah. Sara G. testified that the phone call lasted only thirty seconds and that, at its conclusion, Delilah referred to the respondent as her grandmother.

[15] The respondent also contends that the petitioner obtained the March 29, 2018 visitation order "by means of his fraud upon the court." Specifically, the respondent argues that, during the hearing, the petitioner made several material misrepresentations to the court on which the court relied. According to the respondent, the petitioner's false and misleading statements are relevant to the issue of interference because "the interference exception is akin to the equitable doctrine of clean hands . . . ." (Internal quotation marks omitted.) *In re Tresin J.*, supra, 334 Conn. 332.

The respondent, however, never filed a timely appeal from the March 29, 2018 postjudgment order modifying visitation that she now alleges was obtained by fraud. Nor did she file a motion to open the order within the requisite four month period. See General Statutes § 52-212a; Practice Book § 17-4 (a). As a result, the respondent cannot now mount a collateral attack on the March 29, 2018 order. See *In re Teagan K.-O.*, 212 Conn. App. 161, 182, 274 A.3d 985 (explaining that failure to appeal from order precluded respondent from launching collateral attack on order in later proceedings), cert. denied, 343 Conn. 934, 276 A.3d 974 (2022), and cert. denied, 343 Conn. 934, 276 A.3d 974 (2022); see also *In re Ja'Maire M.*, 201 Conn. App. 498, 505, 242 A.3d 747 (2020) ("We will not . . . review claims that are collateral attacks on prior judgments. With regard to the statutory scheme set forth in § [45a-717], the child's need for stability places an emphasis on the need for litigants to follow proper procedural avenues in order to obtain review."), cert. denied, 336 Conn. 911, 244 A.3d 563 (2021); *In re Stephen M.*, 109 Conn. App. 644, 664, 953 A.2d 668 (2008) ("[t]he best interests of the children, especially their interests in family stability and permanency, support the conclusion that findings in earlier child welfare proceedings cannot be attacked collaterally in later proceedings").

As our precedent recognizes, the relationship between a parent and child is premised on a parent, including a noncustodial parent, exercising her right and responsibility to cultivate and nurture that relationship. That includes taking a timely appeal of or filing a timely motion to open and/ or modify an adverse judgment precisely because of the long established principle that time is of the essence in the life of a child. In the absence of a modification of an otherwise valid judgment that presumably was premised on the finding that it was in the best interests of the child, it was incumbent upon the respondent to comply with whatever orders were required for her to cultivate, maintain, and nurture that relationship. As such, a collateral attack on a prior judgment as a defense to the termination petition is not only impermissible but does not remedy the time lost in the life of the child and the relationship that could and should have been developed due to the failure to seek a timely modification of an allegedly fraudulent judgment.

[16] The respondent also argues that the court applied an incorrect legal test in determining whether the interference exception should apply.

According to the respondent, "[t]he trial court's memorandum of decision improperly focuse[s] on the [petitioner's] intentions in refusing [to] allow the [respondent] to visit with Delilah and, thus, erred as a matter of law."

Although the court noted in its memorandum of decision that "[the petitioner's] insisting [that the respondent] follow the court-ordered visitation schedule under these circumstances was not unreasonable," the court also noted that "[the respondent's] last in-person visit with Delilah was in February of 2017. The court note[d] that [the petitioner's] and [the respondent's] relationship [was] difficult, but the fact that [the petitioner] ha[d] taken a hard line, requiring [the respondent] to abide by the court orders does not rise to the level of interference."

Whether the court applied an incorrect legal test is a question of law over which we exercise plenary review. See *In re Jacob W.*, supra, 330 Conn. 754 ("We first consider whether . . . the trial court applied an incorrect legal test to determine whether the petitioner had proven by clear and convincing evidence the lack of an ongoing parent-child relationship. Because that question presents a question of law, our review is plenary."). "[W]e read an ambiguous trial court record so as to support, rather than contradict, its judgment. . . . We have repeatedly stated that it is the appellant's responsibility to provide an adequate record for review. . . . [W]here the factual or legal basis of the trial court's decision is unclear, the appellant should file a motion for articulation pursuant to Practice Book § [66-5]. . . . In the absence of such action by the [appellant], we must presume that the trial court considered all the facts before it and applied the appropriate legal standards to those facts." (Citations omitted; internal quotation marks omitted.) *Walton* v. *New Hartford*, 223 Conn. 155, 164–65, 612 A.2d 1153 (1992). Although the court characterized the reasonableness of the petitioner's conduct, it did so in reference to the court orders governing the parameters of the respondent's visitation rights, suggesting its acknowledgment of the inapplicability of the interference exception in the context of third-party actions as well as the respondent's own conduct in needing to comply with those orders. Given that record, we presume that the court applied the appropriate legal standard.

[17] Although our Supreme Court in *In re Tresin J.* did not say so explicitly, it clarified that the second prong—whether it would be detrimental to the child's best interests to allow time for such a relationship to develop—is part of the adjudicatory phase rather than the dispositional phase. See *In re Tresin J.*, supra, 334 Conn. 326–27 ("[T]he proper legal test to apply when a petitioner seeks to terminate a parent's rights on the basis of no ongoing parent-child relationship . . . is a two step process. In the first step, a petitioner must prove the lack of an ongoing parent-child relationship by clear and convincing evidence. . . . If, and only if, the petitioner has proven a lack of an ongoing parent-child relationship does the inquiry proceed to the second step, whereby the petitioner must prove by clear and convincing evidence that to allow further time for the establishment or reestablishment of the relationship would be contrary to the best interests of the child. *Only then may the court proceed to the disposition phase*." (Emphasis added; internal quotation marks omitted.)).

[18] The respondent also contends that "the fact that Delilah has many present positive memories of [the respondent] indicates that allowing additional time is not contrary to Delilah's best interests." In part I of this opinion, we concluded that the court did not err in determining that Delilah had no present positive memories of the respondent. We, therefore, are unpersuaded by the respondent's contention.

[19] In her appellate brief, the respondent notes that she will not be allowed to visit with Delilah until and unless she successfully moves to modify the March 29, 2018 court order. As previously noted, however, no evidence was presented that the respondent has sought to challenge the order since its issuance.

[20] The respondent also contends that, "even if [she] is eventually allowed to resume her visits with Delilah, and these visits result in some emotional distress for Delilah, this is not enough, standing alone, to establish that allowing further time for the reestablishment of the parent-child relationship would not be in Delilah's best interests." The respondent relies on *In re Zakai F.*, 336 Conn. 272, 306 n.21, 255 A.3d 767 (2020), which, she argues, "strongly suggested that such evidence would not be sufficient, by itself, to show that reinstatement is not in the child's best interests."

We find the respondent's reliance on *In re Zakai F.* unavailing. The present case is procedurally distinct from *In re Zakai F.*, which involved a motion for reinstatement of guardianship rights. See id., 275. The present case

involves a petition for the termination of parental rights. Thus, unlike *In re Zakai F.*, in the present case, there is no presumption regarding what is in the best interests of the child. See id., 306 ("we conclude that a third party seeking to rebut the presumption that reinstatement of guardianship rights to a parent who has never been found to be unfit is in the best interests of the child must do so by clear and convincing evidence").

---